[No. S020803. July 15, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD BERT STEWART, Defendant and Appellant.

COUNSEL

Melissa Hill, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Ronald A. Bass, Assistant Attorneys General, Ross C. Moody and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, C. J.**—Defendant Richard Bert Stewart appeals from a judgment of the Contra Costa County Superior Court imposing a sentence of death following his conviction of three counts of first degree murder (Pen. Code, § 187),[1] possession of a concealable firearm by a felon (§ 12021), and attempted arson (§ 455). The jury found true a multiple-murder special-circumstance allegation. (§ 190.2, subd. (a)(3).) The jury also found true the allegations that defendant personally used a firearm in the commission of the offenses. (§ 12022.5, subd. (a).) Defendant thereafter admitted two separate prior prison term allegations. (§ 667.5, subd. (b).)

In addition to imposing a judgment of death on each murder conviction, the trial court declared that if for any reason the death sentence should not be carried out, defendant would serve a sentence of life imprisonment without possibility of parole. The court then imposed and stayed a consecutive sentence of seven years eight months on the various remaining counts and enhancements. Defendant's appeal is automatic. (§ 1239, subd. (b).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

We shall affirm the judgment as to guilt and the special circumstance finding, but because of errors in the jury selection process we are compelled by controlling decisions of the United States Supreme Court to reverse the judgment of death and to remand the matter for a new penalty trial before a properly selected jury. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*); *Davis v. Georgia* (1976) 429 U.S. 122, 123 [50 L.Ed.2d 339, 97 S.Ct. 399]; *Gray v. Mississippi* (1987) 481 U.S. 648, 659–667 [95 L.Ed.2d 622, 107 S.Ct. 2045] (opn. of the court); *id.*, at pp. 667–668 (plur. opn.); *id.*, at p. 672 (conc. opn. of Powell, J.).)

## I. FACTS AND PROCEDURAL HISTORY

### A. *Prosecution evidence*

Defendant blamed his mother, Gloria Pillow, and his stepfather, Weldon Ardell Pillow (Ardell), for his confinement in state prison. In 1989, a few months after being paroled, defendant shot to death Ardell and Gloria, along with Murray Lucas, a boarder who then was living with them. We set forth the relevant events leading to and following the commission of these crimes as reflected in the record before us.

Upon being paroled from prison, defendant moved in with his girlfriend Donna Guthrie, who lived at the Atchison Village in Richmond, California. In late June 1989, defendant obtained a .22-caliber semiautomatic Jennings handgun from Frank Walker.

Defendant's cousin, Gary Beach, resided at a house owned by defendant's stepfather Ardell, located on Harbour Way in Richmond. In mid-to-late June 1989, defendant and his girlfriend Donna visited that house, and while in the backyard defendant, holding a small gun wrapped in a handkerchief, fired a practice shot into an exterior garage wall. Rory Pillow—a half brother of defendant who lived in a trailer behind the Harbour Way house—saw and heard defendant fire the shot. After Rory objected to the gunfire, defendant placed the gun, still wrapped in a handkerchief, in his back pocket.

During the evening of July 3, 1989, defendant visited the home of Shane Powell and Mary Perron, the next door neighbors of Ardell and Gloria, at 18th Street in Richmond. Defendant was upset and disturbed; Powell testified that defendant remarked that having been jailed made him "what he is today, and he's not responsible for his actions, whatever they may be," and that "society would just have to deal with that." He complained to Perron and Powell that Ardell and Gloria were alcoholics who treated him like an outcast and embarrassed him, and that Gloria was responsible for his most recent commitment to prison, which resulted from his having been "caught in

possession of a gun," a violation of his "probation." After approximately 20 minutes, defendant departed.

Powell and Peron retired for bed about midnight and thereafter heard numerous explosions of early Fourth of July firecrackers. In the midst of those sounds of exploding firecrackers, Powell awoke at 2:00 or 3:00 a.m. to the sound of gunshots. He heard arguing voices coming from the Pillow home, and then heard Gloria scream, "No, Richard, no." Within seconds, Powell heard two more gunshots, and then silence. Peron's recollection was substantially similar. She remembered being awakened by a "blood curdling scream," heard two shots, and then heard three more somewhat muffled shots. Powell and Peron discussed the matter and decided not to call the police, but instead to go back to sleep.

When Perron and Powell arose the next morning at approximately 10:00 a.m., they noticed that the Pillow residence next door was unusually quiet. Eventually, Perron and Powell went to the back door of the Pillow home, where another neighbor, Phillip Smith, opened the unlocked back door. They smelled gas. Powell entered the house and closed the four open burners of the kitchen stove. Powell found Gloria's body in a bedroom, and Powell and Smith left the house. Powell told Perron to call the police.

The police and the fire department soon arrived and ventilated the house by opening the doors and windows—all of which, except the back door, had been locked. There were no signs of forced entry.

The police found the body of Murray Lucas facedown on the floor of a bedroom near the kitchen. He had been shot in the head. In a bedroom near the living room, the police found Ardell's body lying facedown, halfway off a bed, with his knees on the floor. He had been shot three times in the head. Ardell's bloody and badly broken metal eyeglasses were found on the bed. There were numerous lacerations near his nose and left eye, and the bone at the top of the left eye was fractured. Dr. Louis Daugherty, a forensic pathologist, testified that Ardell might have been struck in the face before being shot. A pair of scissors was in his left hand. Gloria's body was found curled in a corner of the bedroom. She had been shot once in the head, and a pair of eyeglasses was near her right hand. Dr. Daugherty also found that an examination of Gloria's blood reflected a blood-alcohol level of .25 percent— more than three times the limit for driving under the influence of alcohol.

Gunpowder "stippling"—small fragments of gunpowder caused by the near proximity of a discharged firearm—was evident on each of the three victims (the single wounds of Murray Lucas and Gloria, and one of Ardell's three wounds). Based upon the characteristics of the firearm and the stippling on

each victim, Dr. Daugherty estimated that each of the three stippled shots was fired from a distance of three feet or less, with the shot into Murray Lucas being fired from the farthest distance, the shot into Gloria being the second farthest, and the shot (one of three) into Ardell being the closest.

In the living room, officers found the family's dog, apparently strangled to death. Also in that room the police found charred newspapers arranged around an oil lamp, forming a chain leading to the cushion of a chair. No bullet casings were found. An evidence technician testified that if a Jennings semiautomatic pistol had been fired in the house, one would expect to find bullet casings nearby, unless they had been picked up (by someone other than the police).

Richmond Police Officer Socorro Moreno, who was assigned the task of conducting a "neighborhood check" of local residents, met Terry Lynn Guillory. Guillory initially identified himself by using only his first and middle names. Guillory told Moreno that about 1:00 a.m. on July 4, 1989, he heard approximately five consecutive gunshots and ran to look out the street from his living room window. Guillory explained that he saw a White male whom he knew as "Richard" peeking out from the front door of the Pillow home, 546 18th Street. At that point, according to what Guillory related to Moreno, Richard appeared to be panicked, said "Oh shit" or something to that effect, and retreated into the Pillow home.[2]

Eventually, in response to a telephone call from Richmond Detective Darrell Kimura, Guillory agreed to provide a tape-recorded statement concerning his observations. Subsequently, at trial, Guillory testified he had met defendant in the weeks preceding July 1989. Guillory then confirmed his earlier account to Richmond officers, explaining that in the early morning hours of July 4, 1989, he heard five gunshots and proceeded to the front of his house, where he had a view of the Pillow home, which was about 90 to 110 feet away, on the other side of the street. Guillory related that he saw, in the porch light or the street light, defendant's head and shoulders emerge from the front door of the Pillow home, and that he saw defendant look up and down the street. Guillory explained he believed that he and defendant made eye contact, at which point defendant uttered something to the effect of "Oh, shit," and retreated back inside the Pillow home. Guillory then went back to bed.

---

[2] Mary Perron gave a similar account in a statement to Richmond Detective Darrell Kimura, the primary investigator of the case. She related that her neighbor "Terry" told her that he heard gunshots and then saw defendant peek out of the Pillow home. At trial, Perron identified a photograph of Terry Guillory as the neighbor who had related seeing defendant peek out from the Pillow home after the shootings.

When Guillory the next morning learned of the killings, he was concerned that Donna Guthrie, defendant's girlfriend, and Donna's mother, Maxine Corey, might be in danger. Guillory telephoned the Guthrie home at 11:00 a.m. to warn them that if defendant was there, they should make him leave.

Guillory explained at trial that he had been reluctant to become involved in this case, but did so because Donna Guthrie told him she was afraid she would be falsely implicated in the shootings, and because Donna's daughter, Cindy, was a friend of his. Guillory assured Donna he would be able to testify, truthfully, that he had not seen Donna's car at the Pillow house at the time of the shootings. Guillory also admitted, however, that shortly after the shootings, he had attempted to collect $50 that, he claimed, he previously had lent to Donna. Guillory recounted that when he went to her home to collect the money, he found Alan Sjostrand (an inspector with the Contra Costa County District Attorney's Office) and a civilian named Maurice Solvang at the Guthrie home—and that both Sjostrand and Solvang "jumped in [his] face" when he asked Donna for the money. Guillory never did collect the sum.

Guillory confirmed he had identified defendant in an array of photographs shown to him by the police. Guillory also explained that on the morning after commission of the homicides (and contrary to his own testimony at the preliminary hearing), defendant had telephoned him. Guillory conceded that in this respect, he had lied at the preliminary hearing.

On cross-examination, Guillory conceded that he had related to Inspector Sjostrand of having heard "talk on the street" to the effect that both Maurice Solvang and Donna Guthrie had been inside the Pillow home on the night of the murders, but that he had refused to tell Inspector Sjostrand where, or from whom, he had heard this information.

Guillory also testified he had been told by "Pat"—a person who had lived with Donna Guthrie—that there had been a plan to induce Guillory to take Donna Guthrie's daughter Cindy, and Cindy's friend, to Sacramento, at which time, according to Pat, Guillory was supposed to have been "hit" and made to end up "floating" in the Sacramento River.

At the time of his trial testimony, Guillory was in jail, having been arrested approximately one week earlier by Inspector Sjostrand on driving under the influence charges. One of those charges had been pending prior to the commission of the murders underlying the present case. When he was arrested, Guillory reconfirmed to Sjostrand that he had seen defendant peek out from his house after the shootings and utter an obscenity upon seeing him, but threatened to deny having seen and heard defendant.

At trial, as at the preliminary hearing, Guillory was provided use immunity for his testimony relating to two questions: Whether he previously had purchased an "8-ball" (meaning an eighth of an ounce of methamphetamine) from defendant, and whether he had made such a purchase from Donna Guthrie. Guillory answered that he had made one such purchase from each person but that he had not been using drugs on July 3 or 4, 1989. Guillory further testified that no promises had been made to him by any member of the prosecution or any police agency in exchange for his trial testimony.

Richard Schorr, a criminalist employed by the Contra Costa County Sheriff's Office, testified that .22-caliber bullet fragments retrieved from the three victims were consistent with ballistic evidence retrieved by officers from the garage at the Harbour Way residence, where, as noted above, defendant had test-fired a handgun. Because he had only bullet fragments with which to make a comparison, Schorr could not be positive that all of the bullets had been fired from the same gun.

Gloria's funeral was held on July 9, 1989. Defendant, who was not then in custody, did not attend. Defendant was arrested on July 11, 1989. Thereafter, Rory Pillow (Ardell's son) found, in a closet of the Harbour Way house, letters that defendant had sent to his mother, Gloria, while he was in prison. Similarly, Louis Alimonti, Gloria's son and defendant's half brother, found in a dresser in the Pillow house on 18th Street additional letters that defendant had written to Gloria when defendant was in prison.

Prior to the preliminary hearing on December 6, 1989, defendant made numerous attempts to place collect telephone calls to his cousin Gary Beach. Finally Beach accepted a call, and defendant asked Beach to testify that the gun that defendant had test-fired at the Harbour Way house had been a .25- or .32-caliber weapon—and not a .22-caliber firearm. Although defendant told Beach that this testimony could mean "life or death" for him, Beach replied that he would have to "let him know," and did not promise to so testify. Defendant thereafter made numerous additional attempts to contact Beach by collect telephone calls, but Beach would not accept any further calls.

Donna Guthrie, defendant's girlfriend, subsequently supplied to Inspector Sjostrand approximately 25 letters that defendant had written to her after his arrest in mid-July 1989. One of those letters, postmarked November 10, 1989, was introduced and read to the jury. It stated in part: " 'I'm just waiting like a lion, ready to pounce. I've read all the Evidence Code and a lot of law material, and have more books coming. Remind me when I talk to you to explain to you how one little mess can be cleaned. . . . As far as the "cookie" is concerned, he's practically begging them to let him help to hang me. He's a fucking punk. But I'm not going to trip up. . . . So take care of things. You

know the rules!' " (The reference here to "cookie"—and elsewhere to "Oreo"—is a pejorative term that defendant used to describe Guillory, who is of mixed race.) Consistent with the suggestion in defendant's letter, defendant attempted to suppress the testimony of Terry Guillory through a circuitous series of events, as follows.

After his arrest, defendant befriended Jacqueline Coghlan—then the long-term girlfriend of Rick Alimonti, another half brother of defendant's. Soon, Coghlan ended her relationship with Alimonti, and defendant began to telephone Coghlan. She accepted collect calls from him on a daily basis from September to December 1989. Finally, in late November 1989, defendant arranged for Coghlan to visit defendant's father's home in order to collect a check for $1,000.

Defendant told his father that the money would be used for legal services that Coghlan needed in order to settle a property claim involving her former boyfriend. Coghlan retrieved the check from defendant's father on Thanksgiving Day, 1989, cashed it the next day, and, as instructed by defendant, made plans to deliver the funds to a person whom she came to know as Maurice, and whom she assumed was a drug dealer and user. Maurice, however, failed to show up at the appointed meeting time. Coghlan meanwhile decided to remove $200 from the $1,000 proceeds for her own use, in part because she thought that Maurice was a "person who takes drugs and deals drugs" and that giving him so much money "was a waste because I felt I could have used it" better.

After learning of the failed attempt to transfer the funds to Maurice, defendant directed Coghlan to make a second attempt. At defendant's instructions, Coghlan went to a home in El Sobrante, where defendant (from jail) called Coghlan and further instructed her to place a telephone call to a certain number and speak to a man. Coghlan did so and spoke with someone who told her he had arrived late for the prior appointment. They made plans to meet at a nearby Foster's Freeze restaurant. Coghlan drove there and was approached by a man as she sat in her car. She handed him an empty pack of cigarettes, with $800 inside. Coghlan later learned that the man was named Maurice.

Subsequently—on December 5, 1989, the day before commencement of the preliminary hearing in defendant's case—the prosecutor and Inspector Sjostrand went to the home of defendant's girlfriend, Donna Guthrie, in order to interview her. There they also found Maurice Solvang, whom Inspector Sjostrand interviewed as well. During those interviews, Sjostrand learned that Guthrie and Solvang anticipated receiving a telephone call from defendant, and Sjostrand made plans to listen in and record the conversation on the phone's answering machine.

Eventually a collect call from someone identified as "Richard" was received and accepted. After initial remarks, the caller reported that he was "[g]etting ready for my little court in the morning." Maurice asked, "How you doing?" The caller responded: "Okay. Anything ever work out?" Maurice replied, "Oh, yeah. I think so. I mean—um—along which lines?" The caller responded: "Huh?" The conversation soon became unintelligible, and the line disconnected. Later that day, while conducting a second and more extensive interview of Solvang, the prosecution learned of a plot by defendant to prevent Terry Guillory from testifying. The prosecutor and Sjostrand subsequently went to Guillory's residence to notify him of this plot, but did not find him at home.

The following day—December 6, 1989—Inspector Sjostrand interviewed Coghlan during a break in defendant's preliminary hearing. Eventually, Coghlan admitted that the money was designed to persuade the person whom she knew as "the Oreo"—Terry Guillory—not to testify concerning his having seen defendant at the Pillow home on the night of the killings. Coghlan stated, however, that she did not believe there had been a plan to have Guillory killed. After this interview, Sjostrand placed Coghlan under arrest. Coghlan subsequently testified at defendant's trial, as set out above, under a grant of limited immunity from prosecution for the offense of attempting to dissuade a witness from testifying or being an accessory after the fact.

## B. *Defense evidence*

After the prosecution rested, the defense presented the following evidence. William Glass, a private attorney, testified that in the days after the killings he met with defendant and Donna Guthrie and agreed to help arrange defendant's surrender to the Richmond police. The plan was for Glass to meet with defendant at defendant's father's home, and then drive from there, with defendant, to police headquarters. But that plan went awry after Glass telephoned the Richmond police to ask where to surrender defendant. By the time Glass arrived at defendant's father's home, he found seven or eight patrol cars already on the scene and saw that defendant had been arrested.

Contra Costa County Deputy Public Defender Anthony Thompson testified on defendant's behalf that he previously had represented defendant's mother, Gloria, on criminal charges, and that he also had represented defendant in an earlier matter in which defendant had been charged with stealing a gun and some coins from Ardell. Thompson stated that Gloria had attended defendant's various court proceedings, and that in those circumstances she and defendant had been "very" friendly to each other. In addition, Thompson testified that during the earlier proceedings defendant repeatedly expressed a

desire to transfer ownership of his vehicle to his mother (apparently to make up for the value of the lost gun and coins). On cross-examination of Thompson, however, the prosecution read excerpts from two letters that defendant had written to his mother while in custody following these earlier proceedings, demonstrating that defendant in fact blamed his mother and Ardell for his conviction. The first letter read: " 'Now, let me say something. It hurts and pisses me off that you would say something like you did, that if I wouldn't sign [the vehicle] over, you'd—you and Ardell—would go to court and try to get me in all kinds of trouble. I've been up all night here in prison, mad over it, and the more I think, the madder I get. That fucking husband of yours coins weren't worth no fucking $2,000, and neither is his two-bit gun or any Visa trips which bitch Billie ran up.' " The second letter read: " 'How the hell does a person feel when their own parents tell them not to come to their house or act mistrustful of them? Well, why then should the person care what they do? They aren't loved or trusted anyway. They hurt and become mean and bitter.' "

Defendant's father, Richard Stewart, Sr., testified that defendant visited him and his wife in the early evening of July 3, 1989, for approximately 45 minutes. Richard, Sr., recounted that defendant seemed normal, that no apparent problems occurred, but that petitioner was slightly upset that the person who had dropped him off at his father's home had driven away immediately instead of coming in or waiting for defendant. Richard, Sr., gave defendant $6, and defendant then left.

Craig Rock, a special investigator for the public defender's office, testified concerning his interview with Terry Guillory. Rock stated that the window from which Guillory claimed to have looked out and seen defendant provided a view of the Pillow home's front door (which was 90 to 110 feet away) but that the view "could be partially obscured by a telephone pole" if one looked out of the window from a certain position. Rock also reported that nearby trees would partially block light from streetlights, thereby reducing the light that would illuminate the Pillow house. On cross-examination, however, Rock conceded that a light fixture on the Pillows' front porch, and light from within that residence, would illuminate a person of average height standing in the doorway, and that additional light from within the structure also may have illuminated a person standing at that location. Finally, Rock testified that Guillory told him that he hoped defendant never would be released from custody because "[h]e's got my name now."

At the conclusion of the guilt phase of the trial, the jury convicted defendant of the charged offenses and found true the allegations and special circumstance indicated above.

### C. *Penalty phase proceedings*

Prior to commencement of the penalty phase of the trial, defendant moved to dismiss his trial counsel, Public Defender Charles James, and represent himself. The trial court required defendant to reconsider the matter overnight, but when he renewed the motion the following day the court granted his request to represent himself and reappointed James as advisory counsel.

At the penalty phase, the prosecution introduced the following evidence of prior violent crimes committed by defendant as evidence in aggravation: (1) a March 1981 robbery at knifepoint on the campus of the University of California at Berkeley; (2) an October 1981 armed robbery in El Cerrito; (3) an October 1981 violent home invasion and attempted robbery in San Pablo; (4) a mid-1989 stabbing of Vincent Trillo, who then was living with Rory Pillow in the trailer behind the house on Harbour Way; (5) a late June 1989 robbery of Frank Walker, from whom defendant stole the .22-caliber Jennings semiautomatic pistol apparently used in the killings; (6) an April 7, 1990, telephone threat to "reach out and touch" Walker "real hard" if he were to testify against defendant at the penalty phase of the trial; and (7) a late July 1990 stabbing of a fellow jail inmate in the throat with a pencil.

In his own behalf, defendant made a very brief opening statement and then immediately rested without presenting any evidence. Two days later, both parties presented closing arguments and the jury was instructed. As noted above, the jury returned a verdict of death.

### II. ANALYSIS

### A. *Excusal of prospective jurors for cause*

Defendant contends the trial court erroneously excused five prospective jurors for cause, based solely upon their written answers to a jury question-naire concerning their views relating to the death penalty, and without any opportunity for follow-up questioning during which the court and counsel might have been able to clarify the responses and determine whether, in fact, the prospective jurors were disqualified from service.

As we observed in *People v. Cunningham* (2001) 25 Cal.4th 926 [108 Cal.Rptr.2d 291, 25 P.3d 519] (*Cunningham*), decisions of the United States Supreme Court and this court establish that "[a] prospective juror may be challenged for cause based upon his or her views regarding capital punish-ment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and

the juror's oath. (*Wainwright v. Witt*[, *supra*,] 469 U.S. 412, 424; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].)[3] ' " 'A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" [Citation.] In addition, " '[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' [Citation.]" (*Cunningham, supra,* 25 Cal.4th 926, 975; see also *People v. Heard* (2003) 31 Cal.4th 946, 958 [4 Cal.Rptr.3d 131, 75 P.3d 53] (*Heard*).)

Applying these standards in this case, we conclude, for the reasons set forth below, that the trial court erred in excusing five prospective jurors for cause based solely upon their checked responses and written answers on a jury questionnaire.

The trial court, with input from counsel, prepared a 13-page written questionnaire for completion by the prospective jurors. Before distributing the questionnaire, the court orally advised the assembled prospective jurors concerning "essential . . . background . . . on the case and the procedure to be followed." The court explained that the prospective jurors would be asked "some questions regarding the death penalty" because the death penalty was a possibility in the case, and the court was obligated to determine whether each prospective juror could be "be fair to both the prosecution and to the defendant concerning the question of punishment, if we get to that decision."[4] The court proceeded to explain that the case would proceed with a guilt phase—at which the jury would be asked to determine whether, beyond a reasonable doubt, defendant is guilty of the charged offenses, and whether any defined special circumstance is true. The court explained that only if the jury found guilt, and found an alleged special circumstance allegation true, would the jury address a second, or penalty, phase of the trial, at which point the jury would be "asked to select—to choose—between two possible penalties: the death penalty or life [imprisonment] without possibility of parole." The court explained that the prosecution at a penalty phase might

---

[3] Specifically, as the court stated in *Witt, supra,* 469 U.S. at page 424, the relevant question is whether a prospective juror's "views on capital punishment . . . would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "

[4] The court repeatedly stressed that "the fact that I mention this subject at this point by asking the questions in the questionnaire, I'm not suggesting—I'm not implying—not intimating in any way that the jury that is ultimately selected here is going to actually be called upon to make this determination as to choice of penalty."

offer aggravating evidence[5] and the defendant might offer mitigating evidence,[6] and continued: "Now, the jury, in the penalty phase, is not asked simply to do a mechanical weighing of these aggravating and mitigating circumstances. It's not putting them on an imaginary scale and seeing which way it tips. The jury is free to assign whatever moral or sympathetic value it deems appropriate to each and all of the various factors that it is allowed to consider in the choice of penalty decision."[7] The court then asked each prospective juror to complete a questionnaire and leave it with the court's bailiff.

Question No. 35—the only question that focused on prospective jurors' views concerning the death penalty—read in relevant part as follows:

"As explained during the orientation, the Court is asking questions regarding your opinions about the death penalty because one of the possible sentences for a person convicted of the charges the prosecution has filed is the penalty of death. Thus, the Court must determine whether you could be fair to both the prosecution and the defendant if you should ever be called upon to make a decision as to the choice of penalty in this case.

"By asking these questions, the Court is not suggesting in any way that the charges are true and that the only question the jury will have to decide is whether the penalty is to be life imprisonment without parole or death in the gas chamber. It is only because the case could involve such a decision, that the Court must ask you about your opinions on this subject even though it may never be required in this trial. With these comments in mind, please answer the following questions. If you don't understand the question, please so indicate.

"(1) Do you have a conscientious opinion or belief about the death penalty which would prevent or make it very difficult for you:

"(a) To find the defendant guilty of first degree murder regardless of what the evidence might prove?—( ) Yes ( ) No

---

[5] The court defined such evidence as factors that tend to increase a crime's "guilt or enormity," or "add[] to the injurious consequences . . . above and beyond the elements of the crime itself."

[6] The court defined such evidence as factors that might not justify or excuse a crime, but that may extenuate the circumstances of a crime in determining the appropriate penalty.

[7] The court continued: "In deciding the question of penalty, in weighing the various circumstances, the jury determines, under the relevant evidence, which penalty is justified . . . . Each juror must be persuaded that the aggravating circumstances are so substantial in comparison with mitigating circumstances that it warrants the death penalty instead of life [imprisonment] without the possibility of parole. Even if the jury should decide that the aggravating evidence does substantially outweigh the mitigating evidence, the jury may return a verdict of death, but is not required to."

"(b) To find a special circumstance to be true, regardless of what the evidence might prove?—( ) Yes ( ) No

"(c) To ever vote to impose the death penalty?—( ) Yes ( ) No

"If your answer to (a), (b) or (c) is 'Yes,' please explain [in the space provided]."[8]

After the prospective jurors completed their questionnaires and the results were shared with the court and counsel for both parties, the court met with counsel, out of the presence of the prospective jurors, to rule on a number of stipulated challenges for cause—that is, the elimination of those prospective jurors who both counsel agreed should be excused for cause. At the outset, the prosecutor asked for clarification that "[t]he court is anticipating making at least some rulings with respect to cause based upon exclusively the—what would be fairly characterized as 'unambiguous' answers in the question-naire."[9] The court confirmed that intention but commented that an ambiguous response "would have to be cleared up" by questioning the prospective juror. Defense counsel, expressing no objection to this general plan, concurred in the court's assertion that "the ambiguous ones . . . —they're going to have to be done individually." A short while later, the court reiterated its plan, stating that, with regard to prospective jurors as to whom the questionnaires showed "ambiguous responses, those persons can either be deferred to our afternoon or tomorrow's session . . . ."[10]

---

[8] Question No. 35 continued:

"(2) Are your opinions or beliefs about the death penalty of such a nature that you would:

"(a) Vote for first degree murder regardless of what the evidence proved so that the death penalty could be imposed?—( ) Yes ( ) No

"(b) In all cases vote for the death penalty if there is a verdict finding the defendant guilty of first degree murder and a special circumstance to be true regardless of what mitigating evidence might be presented?—( ) Yes ( ) No

"If your answer to (a) or (b) is 'Yes,' please explain [in the space provided]."

[9] As defendant observes, the court earlier had stated: "[I]f it's unmistakably clear that based upon the [prospective juror's] written response to the juror questionnaire, under penalty of perjury, I would—could *not* contemplate excusing those people without further oral examination." (Italics added.) Based upon the trial court's subsequent comments and actual practice described below, however, it may be that the italicized word was spoken in error or was mistranscribed.

[10] This stated plan was consistent with numerous comments made previously by the trial court and defense counsel. For example, early in the discussions concerning use of a juror questionnaire, defense counsel suggested that the court might ask jurors to answer four questions concerning death qualification, but that if a juror's responses to the questions suggested that the juror "could not follow the law," such a juror would be further "questioned privately or whatever" by the court. Defense counsel repeatedly expressed his expectation that there would be oral "judicial voir dire" of these jurors. The court assured counsel that this would, in fact, occur, commenting: "[T]here's going to be a mixture here"—meaning a mixture of written and oral questions. Subsequently, when defense counsel submitted proposed written

The court proceeded to grant 17 stipulated challenges for cause, based solely upon each prospective juror's written responses to the questionnaires.[11] The court deferred ruling on three prospective jurors whom defendant wished to challenge for cause, commenting that "the answers in the questionnaire do not on their face give rise to a challenge for cause" and that "we're just going to have to see what they say when we talk to them." The court then turned its attention to the prospective jurors whom the prosecutor, alone, wished to challenge for cause.

The prosecutor challenged Juror No. 8 "for cause based upon the question-naire." That prospective juror had checked "No" in response to question No. 35(1)(a) and (b), thereby indicating that he or she did not "have a conscientious opinion or belief about the death penalty which would prevent or make it very difficult" to find defendant guilty of first degree murder, or to find a special circumstance to be true, "regardless of what the evidence might prove." But Prospective Juror No. 8 also had checked "Yes" with regard to question No. 35(1)(c)—thereby indicating that he or she had a "conscientious opinion or belief about the death penalty which would prevent or make it very difficult" to "ever vote to impose the death penalty." In addition, in response to the questionnaire's direction to "explain" any "Yes" answer, Prospective Juror No. 8 had written, "I do not believe a person should take a person's life. I do believe in life without parole."

The court asked to hear the view of defense counsel, who objected to excusal for cause on the basis that "because of the global nature of the [question No. 35](1)(c) inquiry," coupled with the written response, there existed ambiguity as to whether the prospective juror would be able to serve and "follow the instructions of the court." The court summarily dismissed these concerns, ruling immediately as follows: "All right. I'm satisfied that

death-qualification questions for use in the court's planned juror questionnaire, counsel made clear his understanding that the trial court would conduct oral follow-up questioning of jurors who expressed difficulty or reluctance to "follow the law," and, for that purpose, went so far as to propose draft "Admonitions for the Court when addressing prospective jurors in oral voir dire." The prosecutor similarly made clear his understanding that the trial court would, after considering the questionnaire answers, conduct oral voir dire of prospective jurors. Later, the court noted its authority to conduct individualized voir dire, if necessary, and defense counsel reiterated his understanding that some prospective jurors would "be privately dealt with" through questioning by the court, outside the presence of the other prospective jurors.

[11] Many of the responses to those questionnaires revealed unambiguous and entrenched support for or opposition to the death penalty. For example, one juror who both parties stipulated should be excused checked "No" to each inquiry in question No. 35(1)(a)–(c), and wrote: "As the Bible says, '[A]n eye for an eye, a tooth for a tooth.' Or in this case a life for a life." Another juror who both parties stipulated should be excused checked "Yes" to each inquiry in question No. 35(1)(a)–(b), and wrote: "I believe that the death penalty is cruel and unusual punishment and is imposed disproportionately on Blacks and other minorities. Furthermore, I do not believe that it is an effective deterrent to the commission of capital offenses."

this is an unambiguous expression of opinion here especially with the added handwritten portion that says, 'I do not believe a person should take a person's life.' "

Thereafter the prosecutor also challenged Jurors No. 53, 59, 93, and 122, each of whom, like Prospective Juror No. 8, had checked "No" in response to question No. 35(1)(a) and (b), and had checked "Yes" with regard to question No. 35(1)(c). In response to the direction to "explain" any "Yes" answer, Prospective Juror No. 53 wrote: "I am opposed to the death penalty." Prospective Juror No. 59 wrote: "I do not believe in capit[a]l punishment." Prospective Juror No. 93 wrote: "In the past, I supported legislation banning the death penalty." Prospective Juror No. 122 wrote: "I don't believe in irrevers[i]ble penalties. A prisoner can be released if new information is found."

Again, defense counsel objected to each of the prosecutor's motions for excusal for cause on the ground that the checked answers and brief written comments left ambiguity as to whether each prospective juror would be able to serve and follow the instructions of the court, notwithstanding his or her personal opposition to the death penalty. As to each objection, the court found the juror's checked answer and brief written response to be clear and unambiguous, and granted the challenge for cause.

On appeal, defendant asserts that each of the trial court's rulings granting the prosecution's five for-cause challenges was erroneous. We agree that the trial court erred in excluding these prospective jurors on the basis of their questionnaire responses alone.

■ Before granting a challenge for cause concerning a prospective juror, over the objection of another party, a trial court must have sufficient information regarding the prospective juror's state of mind to permit a reliable determination as to whether the juror's views would " 'prevent or substantially impair' " the performance of his or her duties (as defined by the court's instructions and the juror's oath) (*Witt, supra*, 469 U.S. 412, 424) " " " 'in the case before the juror' " ' " (*People v. Ochoa* (2001) 26 Cal.4th 398, 431 [110 Cal.Rptr.2d 324, 28 P.3d 78], italics omitted.).

The prosecution, as the moving party, bore the burden of demonstrating to the trial court that this standard was satisfied as to each of the challenged jurors. (*Witt, supra*, 469 U.S. 412, 423 ["As with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality . . . . It is then the trial judge's duty to determine whether the challenge is proper"].) In resting its motion solely

upon the prospective jurors' checked answers and brief written comments on the juror questionnaire, the prosecution apparently acted on the premise that those answers and comments were fully adequate, standing alone, to support a determination by the court that each prospective juror's views would prevent or substantially impair the performance of his or her duties as a juror in the case before the juror. As we shall explain, this premise was mistaken.

As noted above, question No. 35(1)(c) asked each prospective juror whether his or her conscientious opinions or beliefs concerning the death penalty would *either* "prevent *or* make it very difficult" for the prospective juror "to ever vote to impose the death penalty." (Italics added.) In light of the gravity of that punishment, for many members of society their personal and conscientious views concerning the death penalty would make it "very difficult" ever to vote to impose the death penalty. As explained below, however, a prospective juror who simply would find it "very difficult" ever to impose the death penalty, is entitled—indeed, duty bound—to sit on a capital jury, unless his or her personal views actually would prevent or substantially impair the performance of his or her duties as a juror.

■ Decisions of the United States Supreme Court and of this court make it clear that a prospective juror's personal conscientious objection to the death penalty is not a sufficient basis for excluding that person from jury service in a capital case under *Witt, supra,* 469 U.S. 412. In *Lockhart v. McCree* (1986) 476 U.S. 162, 176 [90 L.Ed.2d 137, 106 S.Ct. 1758] (*Lockhart*), the high court observed that "not all those who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of law." Similarly, in *People v. Kaurish* (1990) 52 Cal.3d 648, 699 [276 Cal.Rptr. 788, 802 P.2d 278] (*Kaurish*), we observed: "Neither *Witherspoon* [*v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]] nor *Witt,* [*supra,* 469 U.S. 412,] nor any of our cases, requires that jurors be automatically excused if they merely express personal opposition to the death penalty. The real question is whether the juror's attitude will ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Wainwright v. Witt, supra,* 469 U.S. at p. 424, fn. omitted.) A prospective juror personally opposed to the death penalty may nonetheless be capable of following his oath and the law. *A juror whose personal opposition toward the death penalty may predispose him to assign greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict.*" (Italics added.)

██ *Kaurish, supra*, 52 Cal.3d 648, recognizes that a prospective juror may not be excluded for cause simply because his or her conscientious views relating to the death penalty would lead the juror to impose a higher threshold before concluding that the death penalty is appropriate or because such views would make it very difficult for the juror ever to impose the death penalty. Because the California death penalty sentencing process contemplates that jurors will take into account their own values in determining whether aggravating factors outweigh mitigating factors such that the death penalty is warranted, the circumstance that a juror's conscientious opinions or beliefs concerning the death penalty would make it very difficult for the juror ever to impose the death penalty is not equivalent to a determination that such beliefs will "substantially impair the performance of his [or her] duties as a juror" under *Witt, supra*, 469 U.S. 412. In other words, the question as phrased in the juror questionnaire did not directly address the pertinent constitutional issue. A juror might find it very difficult to vote to impose *the death penalty*, and yet such a juror's performance still would not be substantially impaired under *Witt*, unless he or she were unwilling or unable to follow the trial court's instructions by weighing the aggravating and mitigating circumstances of the case and determining whether death is the appropriate penalty under the law.

It follows that a qualified juror might well answer "Yes" to the inquiry posed in question No. 35(1)(c), and yet, in response to brief follow-up questioning, persuasively demonstrate an ability to put aside personal reservations, properly weigh and consider the aggravating and mitigating evidence, and make that very difficult determination concerning the appropriateness of a death sentence. Such a prospective juror would not be substantially impaired in performing his or her duties as a juror. The record here, however, suggests that the trial court erroneously equated (i) the nondisqualifying concept of a very difficult decision by a juror to impose a death sentence, with (ii) the disqualifying concept of substantial impairment of a juror's performance of his or her legal duty, and failed to recognize that question No. 35(1)(c), standing alone, did not elicit sufficient information from which the court properly could determine whether a particular prospective juror suffered from a disqualifying bias under *Witt, supra*, 469 U.S. 412, 424.[12]

---

[12] We are unaware of any prior juror questionnaire that has employed the phrasing, "prevent or make it very difficult," used in this case. See, for example, California Center for Judicial Education and Research, California Continuing Judicial Studies Program, Death Penalty Trials (Aug. 2002) pages 91–95, 115–119 (providing two sample juror questionnaires for capital cases, neither of which employs such language). The relevant language of the first sample questionnaire asks, "Would you, because of any views that you may have concerning capital punishment, automatically refuse to vote in favor of the penalty of death and automatically vote for a penalty of life imprisonment without the possibility of parole, without considering any of the evidence of any of the aggravating and mitigating factors (to which you will be instructed) regarding the facts of the crime and the background and character of the defendant?

Nor did the brief written answers supplied by the five prospective jurors, considered in conjunction with their checked answers to question No. 35, provide an adequate basis upon which to dismiss any of those jurors for cause.

As noted, Prospective Juror No. 8 wrote, "I do not believe a person should take a person's life. I do believe in life without parole." We understand these two sentences as stating a generalized opposition to the death penalty, and approval of the sentence of life in prison without possibility of parole. But as noted above, *Lockhart, supra,* 476 U.S. 162, 176, and *Kaurish, supra,* 52 Cal.3d 648, 699, make clear that many members of society—and thus many prospective jurors—may share those exact same sentiments, and yet remain qualified to sit as a juror under the standard set out in *Witt, supra,* 469 U.S. 412, 424.

To be sure, Prospective Juror No. 8's checked answer to question No. 35(1)(c) and written comment quoted above provided a *preliminary* indication that the prospective juror *might* prove, upon further examination, to be subject to a challenge for cause. Absent clarifying follow-up examination by the court or counsel, however—during which the court would be able to further explain the role of jurors in the judicial system, examine the prospective juror's demeanor, and make an assessment of that person's ability to weigh a death penalty decision—the bare written response was not by itself, or considered in conjunction with the checked answer, sufficient to establish a basis for exclusion for cause.

We reach the same conclusion with respect to the four other prospective jurors who were excused over defense objection. Prospective Juror No. 53 wrote: "I am opposed to the death penalty." But the same general opposition might be stated by many jurors who are properly qualified to sit on a death penalty jury, and is not disqualifying in and of itself, or considered in conjunction with the checked answer. (*Lockhart, supra,* 476 U.S. 162, 176; *Kaurish, supra,* 52 Cal.3d 648, 699.) Prospective Juror No. 59 wrote: "I do not believe in capit[a]l punishment." That same juror, however, also wrote, "I don't know" in response to question No. 35(2), which (as observed *ante,* fn. 8) probed personal opinions or beliefs *favoring* the death penalty. At a minimum, this juror's written responses suggested ambiguity and a need for clarification on oral voir dire; at most, this juror, like those addressed above, expressed a general opposition to the death penalty that is not, by itself or

---

[At this point the questionnaire provides lined space for comments]." (*Id.,* at p. 93.) The relevant language of the second sample questionnaire asks, "Do you have feelings against the death penalty which are so strong that you would always vote against the death penalty? YES NO [¶] Please explain: [at this point the questionnaire provides lined space for comments]." (*Id.,* at p. 118.)

considered in conjunction with the checked answer, disqualifying. Prospective Juror No. 93 wrote: "In the past, I supported legislation banning the death penalty." Again, the same might be said by many jurors who are properly qualified to sit on a death penalty jury. Disagreement with the current state of the law is not disqualifying by itself or considered in conjunction with the checked answers. Finally, Prospective Juror No. 122 explained, "I don't believe in irrevers[i]ble penalties. A prisoner can be released if new information is found." This explanation, reflecting a concern regarding the risk of error in the criminal justice process, is not disqualifying by itself or considered in conjunction with the checked answers.

As with Prospective Juror No. 8, the combination of checked answers and written responses of these other four potential jurors (Nos. 53, 59, 93, and 122) provided a *preliminary* indication that each juror *might* prove, upon further examination, to be subject to a challenge for cause. Again, however, absent clarifying follow-up examination, during which the court may have (i) further explained the role of jurors, (ii) probed, among other issues, whether each prospective juror could undertake the decision described in question No. 35(1)(c) if he or she were personally satisfied beyond a reasonable doubt concerning defendant's guilt, and (iii) assessed each person's ability to faithfully and impartially weigh a death penalty decision, the bare checked answers and brief written comments were insufficient to establish substantial impairment of these prospective jurors.

In concluding that all five prospective jurors (Nos. 8, 53, 59, 93, and 122) were erroneously excused for cause based solely upon the combination of their checked answers to question No. 35(1)(c) and their brief written comments, we need not and do not hold that a trial court never may properly grant a motion for excusal for cause over defense objection based solely upon a prospective juror's checked answers and written responses contained in a juror questionnaire.[13] We are, however, unaware of any authority upholding

---

[13] Although the People cite *Darden v. Wainwright* (1986) 477 U.S. 168 [91 L.Ed.2d 144, 106 S.Ct. 2464], for the proposition that "a single death-qualification question may justifiably lead to dismissal for cause," that case is plainly distinguishable. The question in that case was asked by the trial court on oral voir dire, and the prospective juror—a retired former employee of a seminary—answered in person, in front of the judge. (*Id.*, at p. 178.) The high court observed in *Darden* that in making its assessment of "substantial impairment" under *Witt, supra*, 496 U.S. 412, 424, "[t]he trial court, 'aided as it undoubtedly was by its assessment of [the potential juror's] demeanor,' " "could take account of the fact that [the prospective juror] was present throughout an entire series of questions [posed orally by the court to other prospective jurors] that made the purpose and meaning of the *Witt* inquiry absolutely clear." (*Darden*, 477 U.S. at p. 178, citation omitted.) In addition, the high court observed, "[n]o specific objection was made to the excusal of [the prospective juror] by defense counsel. . . ." (*Ibid.*) None of those circumstances applies in the present case.

such a practice.[14] In *United States v. Chanthadra* (10th Cir. 2000) 230 F.3d 1237 (*Chanthadra*), the United States Court of Appeals for the Tenth Circuit—while explicitly reserving judgment on the broad question of whether a trial court *always* has an obligation "to voir dire prospective jurors before removing them for cause based on their views on the death penalty" (*id.*, at p. 1269)—found it necessary to reverse a death penalty judgment after the trial court, over objection, excused nine jurors for cause, based solely upon the jurors' responses to a juror questionnaire. The court in *Chanthadra*, reviewing the record with respect to only one of those prospective jurors, found that the prospective juror's written responses, in and of themselves, did not establish that the juror was disqualified to serve under the standard set forth in *Witt, supra*, 469 U.S. at page 424 (*Chanthadra, supra*, at pp. 1270–1272) and thus found that the trial court erred by granting the challenge. (*Id.*, at p. 1272; cf. *State v. Anderson* (2000) 197 Ariz. 314 [4 P.3d 369, 372–379] (*Anderson*) [finding error in excusing three jurors over objection for cause based solely upon each juror's responses to a juror questionnaire].)

Like the court in *Chanthadra, supra*, 230 F.3d 1237, 1272, we do not suggest that all or indeed any of the prospective jurors at issue in this case eventually would have withstood a properly adjudicated challenge for cause. We simply do not know how these potential jurors would have responded to

---

[14] The People suggest that such a practice was employed or endorsed in *People v. Samayoa* (1997) 15 Cal.4th 795, 824 [64 Cal.Rptr.2d 400, 938 P.2d 2], and *People v. Carpenter* (1997) 15 Cal.4th 312, 353–354 [63 Cal.Rptr.2d 1, 935 P.2d 708]. We find no such indication in either case.

In *Heard, supra*, 31 Cal.4th 946, 966, footnote 9, we noted and listed "numerous . . . publications that exist to assist [trial courts] in properly conducting voir dire in capital cases." We have not found in any of those listed resources any suggestion that the procedure employed by the trial court here in granting challenges for cause over defense objection—involving *exclusive* reliance upon checked answers to questions and brief written comments—is permissible or adequate. Instead, those sources proceed on the assumption that, except for prospective jurors who both parties stipulate should be excused for cause (see *People v. Ervin* (2000) 22 Cal.4th 48, 73–74, 78 [91 Cal.Rptr.2d 623, 990 P.2d 506]), a juror questionnaire will not *obviate* the need for oral voir dire, but instead merely will shorten the time necessary to be spent on oral voir dire. (See Cal. Center for Judicial Education and Research (CJER), Death Penalty Benchguide 98: Pretrial and Guilt Phase (2001) § 98.24(1), p. 98-27 ["[U]se of a jury questionnaire substantially shortens the jury selection process . . . . Oral voir dire, whether by judge or counsel, may be largely limited to clarifying unclear or incomplete questionnaire responses"]; *id.*, § 98.35, p. 98-35 ["[The court should follow up on ambiguous answers or give counsel an opportunity to do so"].)

The People also asserted at oral argument that under *People v. Bittaker* (1989) 48 Cal.3d 1046 [259 Cal.Rptr. 630, 774 P.2d 659], a trial court has discretion to deny all questioning by counsel concerning a prospective juror who has given "unequivocally disqualifying" responses. (*Id.*, at pp. 1084–1085.) Putting aside the question of the circumstances under which defense counsel has a right to rehabilitate a prospective juror—an issue we do not address here—we observe that in the case before us the questionnaire answers of the prospective jurors simply were not "unequivocally disqualifying."

appropriate clarifying questions posed to them by the trial court. Had the trial court conducted a follow-up examination of each prospective juror and thereafter determined (in light of the questionnaire responses, oral responses, and its own assessment of demeanor and credibility) that the prospective juror's views would substantially impair the performance of his or her duties as a juror in this case, the court's determination would have been entitled to deference. (*Witt, supra,* 469 U.S. 412, 426–430; see, e.g., *People v. Ervin, supra,* 22 Cal.4th 48, 70–71 [deferring to trial court's finding, based upon voir dire responses and prospective jurors' demeanor, that prospective jurors had demonstrated inability to impose death penalty]; *Chanthadra, supra,* 230 F.3d 1237, 1269–1270.)

In according deference on appeal to trial court rulings on motions to exclude for cause, appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record. (*Chanthadra, supra,* 230 F.3d 1237, 1270.) As the high court observed in *Witt, supra,* 469 U.S. 412, 428, "the question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind . . . based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." Indeed, as the high court noted in *Witt,* " '[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.' " (*Id.,* at p. 428, fn. 9, quoting *Reynolds v. United States* (1879) 98 U.S. 145, 156–157 [25 L.Ed. 244].)

In the present matter, however, the trial court's determination was informed by no more information than the cold record of the five prospective jurors' check marks and brief handwritten comments—the exact same information that we have before us now. (Accord, *Chanthadra, supra,* 230 F.3d 1237, 1270.) As explained above, that information was insufficient to support an assessment, required by *Witt, supra,* 469 U.S. 412, 424, that any of the five prospective jurors would be unable faithfully to perform the duties required of a juror by the law. Accordingly, we conclude that, on the record before the trial court (and before us), the trial court erred in dismissing the five prospective jurors for cause without first conducting any follow-up questioning. Indeed, although the poor phrasing of the juror questionnaire used in this case contributes to our conclusion that the prospective jurors were excused in violation of *Witt, supra,* 469 U.S. 412, 424, we note that even if the questionnaire had tracked the "prevent or substantially impair" language of

*Witt*, we still would find that the prospective jurors could not properly be excused for cause without any follow-up oral voir dire by the court.

In opposing this conclusion, the People raise a number of arguments, none of which we find persuasive.

The People assert that defendant waived any objection to "use of a juror questionnaire for the purpose of death qualification." To the extent the People assert that defendant waived objection to the use of a questionnaire in which death qualification questions may be asked, we find it unnecessary to resolve that issue, because undoubtedly it was proper for the court to employ a juror questionnaire, and defendant had no right to prevent the use of a juror questionnaire that included death-qualification questions. But to the extent the People assert that defendant waived objection to the trial court's decision to resolve the prosecution's five motions for excusal based *solely* upon each prospective juror's checked answers and brief written comments, we disagree. Our review of the record discloses no indication that defendant, explicitly or implicitly, conceded the propriety of that course of action. Indeed, as explained above, the record discloses that the court clearly assured both counsel that it would conduct oral voir dire in order to address any ambiguous responses (see *ante*, fn. 10), and thereafter defense counsel repeatedly objected to each of the five excusals here at issue on the ground that the questionnaire's checked answers and brief written responses did not afford sufficient grounds for excusal under the standard set out in *Witt, supra*, 469 U.S. 412, 424.

The People also assert that defendant waived any objection to the trial court's use of the phrase "prevent or make it *very difficult*" (italics added) instead of *Witt*'s language, "prevent or substantially impair," in question No. 35(1). As the People observe, the trial court, apparently without objection, inserted the italicized term into its own proposed formulation of question No. 35(1) after having read a similar phrase ("very hard—if not impossible") in one of four questions that defendant had submitted in response to the trial court's specific request for proposed juror questionnaire language.

The People's argument appears to be one of invited error, not waiver. In any event, as explained below, the People's assertion—however characterized—lacks merit.

In response to the trial court's request for proposed juror questionnaire language, defense counsel submitted four death-qualification questions, the

last of which employed the phase, "very hard—if not impossible."[15] But the context in which that phase was suggested by defense counsel to the trial court was significantly different from the context in which the trial court's revised phrasing, "prevent or make it very difficult," ultimately was employed. It is clear that the prospective jurors' answers to written questions— however phrased—never were intended by defense counsel to provide the *sole* information upon which the trial court would base its determination of *contested* challenges for cause. Indeed, as noted above, the trial court repeatedly had confirmed during pretrial discussions that it would undertake appropriate oral voir dire of jurors who were challenged for cause. In suggesting questionnaire language at the trial court's specific behest, there is no indication that defense counsel contemplated that the trial court subsequently would rely solely upon the juror questionnaires and refuse to conduct any oral voir dire before ruling on the People's five contested for-cause challenges.[16]

Accordingly, we perceive no basis upon which to conclude that defendant is procedurally barred from raising the claim that the trial court erred by granting the People's contested challenges for cause, based solely upon the prospective jurors' answers to question No. 35(1)(c) as phrased, and their brief written responses.

---

[15] Defense counsel's proposed questions read:

"12. If the Court instructs you to consider all the evidence and to weigh both the aggravating and mitigating evidence before deciding on penalty, would you be able to set aside your personal views on the death penalty?
"Yes ( ) No ( )

"13. In all honesty, is your opinion on the death penalty such that it would prevent or substantially impair your performance as a fair and unbiased juror in this case?
"Yes ( ) No ( )

"14. Would your views about the death penalty prevent or substantially impair your ability to follow the law and the judge's instructions in this case?
"Yes ( ) No ( )

"15. Would your personal views on the death penalty make it very hard if not impossible for you to consider all the evidence and follow the Court's instructions to weigh the evidence before deciding on punishment in a penalty trial?
"Yes ( ) No ( )" (Underscoring omitted.)

[16] Furthermore, defense counsel's suggested question, from which the trial court adopted its phrase, "very difficult," was directed at the *decisionmaking process*—that is, whether prospective jurors who leaned either for or against the death penalty could "*consider* all the evidence and *follow* the Court's instructions to weigh the evidence *before deciding on punishment*." As a tool offered to glean *preliminary* information about the views of prospective jurors, preparatory to follow-up questioning by the court or counsel, this question and phrasing would have been unobjectionable. As revised and employed by the court, however, the question was directed only to those who held reservations concerning the death penalty, and inquired not about the decisionmaking process, but whether the prospective jurors could reach the ultimate decision to impose the death penalty.

The People also assert that "[i]n any event, the prospective jurors who were excused here, to a person, made it clear that a death verdict would be more than 'very difficult.' [Citations.] Their explanations were emphatic. If there was any impropriety in . . . the questionnaire's not calling for a more emphatic answer than whether the jurors might find it 'very difficult' to apply the state's death penalty law, any shortcomings were cured by the uniform strength of the excused jurors' unequivocal responses." As explained above, although the checked answers of the prospective jurors to the question as posed (and their brief written comments) may well have contributed support to a *subsequent* determination that the trial court might have reached after oral voir dire and an opportunity to observe the demeanor and assess the credibility of each prospective juror that each was subject to challenge for cause under *Witt, supra,* 469 U.S. 412, 424, the bare checked answers and brief written comments, in themselves, were insufficient to support such a challenge. (Accord, *Chanthadra, supra,* 230 F.3d 1237, 1270–1272; *Anderson, supra,* 4 P.3d 369, 373–374.)

Finally, citing portions of the record in which the trial court inquired of counsel whether they wished to submit follow-up questions to prospective jurors, the People assert that there was in fact substantial opportunity for follow-up questioning of these jurors. But because the People's cited examples of opportunities for follow-up questioning occurred *after* the trial court had granted the prosecution's contested challenges for cause—and long after those prospective jurors were excused from service—those opportunities did not serve to address or cure the court's error in granting the contested for-cause challenges here at issue.

■ For the reasons set forth above, we conclude that the record does not support the trial court's excusals for cause under the governing legal standard (*Witt, supra,* 469 U.S. 412, 424), and that under the compulsion of United States Supreme Court cases this error requires reversal of defendant's death sentence, without inquiry into prejudice. (See *Davis v. Georgia, supra,* 429 U.S. 122, 123; *Gray v. Mississippi, supra,* 481 U.S. 648, 659–667 (opn. of the court); *id.,* at pp. 667–668 (plur. opn.); *id.,* at p. 672 (conc. opn. of Powell, J.); *People v. Ashmus* (1991) 54 Cal.3d 932, 962 [2 Cal.Rptr.2d 112, 820 P.2d 214]; accord, *Chanthadra, supra,* 230 F.3d 1237, 1272–1273, 1275.)

As in another recent case (*Heard, supra,* 31 Cal.4th 946), we are troubled by this result because the error here at issue easily could have been avoided. In essence, the penalty judgment in this matter was doomed from the inception, merely because the trial court failed to take the extra few minutes that would have been required to clarify the ambiguity inherent in the questionnaire responses of the five excused prospective jurors. (*Id.,* at p. 968.) Such an outcome should be avoided in future trials, not only through the

conduct of the trial court, but also through the proper involvement of counsel, who have since 2001 enjoyed expanded rights to participate in oral voir dire. (See Code Civ. Proc., § 223, as amended by Stats. 2000, ch. 192, § 1.)[17]

■ Although the penalty judgment must be reversed on this basis, past decisions make it clear, contrary to defendant's assertions, that error under *Witt, supra,* 469 U.S. 412, 424, does not require reversal of the guilt judgment or special circumstance finding. (*Heard, supra,* 31 Cal.4th 946, 972–982 [reversing penalty phase judgment for erroneous exclusion of prospective juror for cause, but affirming guilt judgment and special circumstance findings]; see *Lockhart, supra,* 476 U.S. 162, 173–184 [rejecting assertion that exclusion of "guilt phase includables" at the guilt phase of a bifurcated capital trial offends constitutional "fair-cross-section" or "impartial jury" guarantees]; *People v. Ashmus, supra,* 54 Cal.3d 932, 956–957 [same, under both federal and state law].) Defendant has not provided any persuasive basis upon which to reconsider that authority or view the trial court's error as a "structural defect" that impugned the entire proceeding below. Accordingly, we proceed to consider defendant's remaining claims relating to the guilt judgment and the special circumstance finding.

### B. *Claims related to Code of Civil Procedure section 223*

Code of Civil Procedure section 223, as amended by section 7 of Proposition 115 (approved by the electorate effective June 6, 1990), provided at the time of trial in this matter: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death cases.[18] [¶] Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause. [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in

---

[17] As observed *post,* part II.B., at the time of trial in the present case, Code of Civil Procedure section 223 provided for court-conducted voir dire, with participation from the parties only upon a showing of "good cause." As amended effective in 2001, section 223 now provides in relevant part: "Upon completion of the court's initial examination, counsel for each party shall have the right to examine, by oral and direct questioning, any or all of the prospective jurors. . . ." (See Stats. 2000, ch. 192, § 1.)

[18] As amended effective in 2001, this statute now confers upon counsel for the parties a limited *right* to examine prospective jurors, following the court's initial examination. (See *ante,* fn. 17.)

a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."

Defendant argues that the trial court's use of a juror questionnaire violated Code of Civil Procedure section 223, because the prospective jurors who completed the questionnaire did not do so "in the presence of [the] other [prospective] jurors." In *People v. Earp* (1999) 20 Cal.4th 826 [85 Cal.Rptr.2d 857, 978 P.2d 15] (*Earp*), however, we characterized the use of such questionnaires as being "[c]onsistent with" Code of Civil Procedure section 223. (*Earp, supra*, 20 Cal.4th at p. 851, italics added.)[19] As noted, Code of Civil Procedure section 223 requires that voir dire be conducted in the presence of all other prospective jurors "where practicable." It would be neither practicable nor particularly useful to require that prospective jurors provide answers to juror questionnaires in the presence of other jurors. As we implied in *Earp, supra*, 20 Cal.4th 826, 851, a trial court retains discretion to employ juror questionnaires as an aspect of the jury selection process, and the trial court properly did so in this case, consistent with Code of Civil Procedure section 223.

Defendant also argues that the actual juror questionnaire employed in this case violated Code of Civil Procedure section 223, because it included questions that were not "in aid of the exercise of challenges for cause." The questionnaire asked each prospective juror to provide information concerning the prospective juror's full name, and other names used; marital status; employment status; employment status of household members and children; education and subjects of study; education and areas of study of household members; military service; health problems; medication taken; connections with law enforcement; unpleasant or pleasant experiences with law enforcement; experience with victimization by crime; arrests for or commission of crimes; opinions formed concerning prosecuting or defense counsel; membership in anticrime organizations; training in the law; prior jury or grand jury service; prior knowledge of the case or persons involved in the case; willingness to follow the court's instructions; exposure to media coverage; attitudes toward gun possession; and (as described *ante*, pt. II.A.) attitudes concerning the death penalty. The trial court below concluded that these and similar questions were in aid of discovering bases for challenges for cause, in that they help to "shed more light on the question of whether they are vulnerable to a challenge for cause." We agree and find no error.

Finally, defendant asserts that use of the questionnaire denied him his right to an impartial jury, because the prosecution thereby obtained information upon which to base its peremptory challenges. Of course, the questionnaire

---

[19] As defendant concedes, statutory authority for use of juror questionnaires is provided by Code of Civil Procedure, section 205, subdivisions (c) and (d).

answers also provided defense counsel with information upon which to base his own peremptory challenges. We perceive no denial of defendant's right to an impartial jury on this ground. (See *Earp, supra,* 20 Cal.4th 826, 853 ["the trial court's voir dire procedure fully satisfied the requirements of the state and federal Constitutions that a fair and impartial jury determine questions of guilt and penalty"].) Nor do we perceive any miscarriage of justice on this ground. (See Code Civ. Proc., § 223, par. 3.)

### C. *General adequacy of the jury selection voir dire*

Defendant asserts the trial court deprived him of his state and federal constitutional rights to a fair and impartial jury because it failed to conduct an adequate voir dire inquiry into various topics about which, defendant claims, the court should have been aware on the basis of the case file. These topics include the prospective jurors' attitudes concerning: (i) defendant's prior criminal record and status as a felon; (ii) the content of letters that defendant wrote while in prison referring, for example, to his "near continuous incarceration since the age of sixteen"; (iii) defendant's past drug use; (iv) defendant's apparent racial bias (he is White) against Blacks, and his repeated references to Terry Guillory (who is of both White and Black racial heritage) as "cookie" or "Oreo"; (v) defendant's use of a swastika to decorate two of his letter signatures; (vi) defendant's offer, in a letter, to perform oral sex on Donna Guthrie; (vii) defendant's general minimization of his own personal responsibility for his past crimes; (viii) the effect that gruesome crime-scene photographs might have on prospective jurors; (ix) the attitudes of prospective jurors concerning the killing of animals (as it related to the killing of the victims' dog); and (x) defendant's various social and political views, such as his support for the Chinese students' uprising at Tiananmen Square, and his criticism of governmental policies concerning confiscation of private property, interference with sexual relations, punishment of so-called victimless crimes, and inadequate compensation of prison laborers. In addition, defendant asserts that his trial counsel was constitutionally ineffective for having failed to request, or undertake, supplemental voir dire on these subjects.

Contrary to defendant's view, we do not agree that the trial court erred by failing, on its own motion, to pose voir dire questions addressed to these specific topics. As explained above, the trial court conducted voir dire by having the prospective jurors complete a 13-page questionnaire that probed a number of issues relating to potential bias. Although the trial court did not conduct follow-up oral voir dire with respect to the five prospective jurors discussed in part II.A., *ante,* it did undertake significant follow-up voir dire examination as to *other* prospective jurors (including the jurors who actually sat on the case), consisting of individual examination of various jurors who asked for a private session, preinstructions to groups of prospective jurors,

and examination, in open court, of numerous prospective jurors. Moreover, as to these jurors and prospective jurors, the court expressly invited follow-up voir dire examination by counsel for both parties. Viewing the voir dire record as a whole, we cannot say that the voir dire was inadequate and that the resulting trial was fundamentally unfair. (*People v. Holt* (1997) 15 Cal.4th 619, 661 [63 Cal.Rptr.2d 782, 937 P.2d 213].) We agree that many of the areas of inquiry proposed for the first time in defendant's appellate briefs, if reduced to questions on voir dire, might have assisted defense counsel in exercising challenges. But, as the high court observed in *Mu'Min v. Virginia* (1991) 500 U.S. 415, 425–426 [114 L.Ed.2d 493, 111 S.Ct. 1899], "to be constitutionally compelled, . . . it is not enough that such questions be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair."

Defendant, quoting *Turner v. Murray* (1986) 476 U.S. 28 [90 L.Ed.2d 27, 106 S.Ct. 1683] (*Turner*), notes that "because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." (*Id.*, at p. 35 (opn. of White, J.).) As an initial matter, we observe that *Turner*, like other cases relied upon by defendant, is distinguishable in that it involved a trial court's *refusal* upon request by defense counsel to probe possible race-related bias. (*Id.*, at pp. 30–31.) In the present case, by contrast, there was no such request, and defendant cites no authority for the proposition that the trial court had a sua sponte duty to probe such a matter on its own. We also note that defendant and his victims were of the same race (Caucasian), and that, unlike the situation focused upon in *Turner, supra,* 476 U.S. 28—that is, an effort to expose racial biases that *prospective jurors may harbor* due to the race of the victim or defendant—here defendant's concern appears to be related to how prospective jurors would react to *his* bigotry and use of a swastika. In any event, because the penalty judgment must be reversed for the reasons set out in part II.A., *Turner* provides no basis for additional relief inasmuch as that decision expressly does not implicate the remaining guilt and special circumstance determinations. (See *Turner, supra,* 487 U.S. at pp. 37–38 [vacating the penalty judgment but not the guilt judgment].)

The trial court acted within its discretion by channeling the voir dire examination of the jurors within reasonable bounds and in a manner designed to expedite the jury selection process. (*People v. Wright* (1990) 52 Cal.3d 367, 419 [276 Cal.Rptr. 731, 802 P.2d 221].) Trial counsel for defendant was given an opportunity to submit or ask additional voir questions of the prospective jurors who had not been excused for cause over objection, and yet declined to do so. Under these circumstances, the trial court did not err in failing to ask, on its own motion, the more probing questions that defendant now advances.

Nor do we agree that trial counsel performed in a constitutionally inadequate manner by failing to probe the issues framed by defendant's appellate counsel. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687–696 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 215–218 [233 Cal.Rptr. 404, 729 P.2d 839] (*Ledesma*).)

■ First, as we have long observed, if the record does not preclude a satisfactory explanation for counsel's actions, we will not, on appeal, find that trial counsel acted deficiently. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134] (*Mendoza Tello*) [" ' "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected' "], quoting *People v. Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; and *People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859] (*Pope*).) On the record before us, we have no reason to question that counsel pursued a reasonable tactical choice by declining to highlight immediately to the prospective jurors the various unsympathetic aspects of defendant's personality and character described above, and by relying instead upon the subsequent voir dire that was conducted (including the court's extensive preinstructions, advising that each juror would be required to "retain and keep your neutrality," make his or her determination based upon the evidence only, without the influence of "passion and prejudice," and be impartial) and upon the court's subsequent instructions to the jury, limiting each juror's consideration to the evidence and precluding the jurors from being swayed by speculation, passion, prejudice, or conjecture, and directing each juror to focus upon whether there was proof beyond a reasonable doubt of the elements of the crimes and special circumstance charged. Defendant fails to establish deficient performance under an objective standard of professional reasonableness. (*Strickland, supra,* 466 U.S. 668, 687–691; *Ledesma, supra,* 43 Cal.3d 171, 216–217.)

Second, defendant also fails to establish prejudice, that is, a reasonable probability of a more favorable outcome in the absence of the assertedly deficient performance. (*Strickland, supra,* 466 U.S. 668, 691–696; *Ledesma, supra,* 43 Cal.3d 171, 217–218.) As the court observed in *Strickland,* "[a] reasonable probability [of a more favorable outcome in the absence of the assertedly deficient performance] is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694.)

The evidence of defendant's guilt was very strong. He test-fired a gun shortly before the killings; the bullet fired from that gun bore markings consistent with the bullets taken from the victims. Defendant's letters from

prison showed his alienation, anger, and despondency over the role played by his mother and Ardell in causing him to be sent back to prison. Defendant visited Shane Powell and Mary Perron shortly before the killings, complaining of the treatment by his family and asserting that having been jailed made him "what he is today, and he's not responsible for his actions, whatever they may be," and that "society would just have to deal with that." Powell and Perron heard the scream, "No, Richard, no" at the same time they heard the gunshots. Soon after the gunshots were fired, Terry Guillory saw defendant peek out from the front door of the Pillow home and make eye contact with him, heard defendant say something to the effect of "Oh shit," and then saw defendant shut the door and retreat into the Pillow home. Defendant thereafter was missing for several days and did not attend his mother's funeral. After defendant was incarcerated following his arrest, defendant attempted to convince his cousin, Gary Beach, to alter his testimony concerning the type of gun defendant had test-fired, and defendant also attempted to keep Terry Guillory from testifying by having Jacqueline Coghlan transfer $1,000 to Maurice Solvang.

In addition to this strong evidence of identity and motive, the prosecution presented strong evidence concerning the mental elements of the crimes. The close range and placement of the shots; the selection of the early morning of the Fourth of July (when gunshots in the neighborhood might be masked or made less noticeable by firecrackers or other "celebratory" gunshots) as the date for the crimes; the apparent effort to rid the crime scene of bullet cartridges; the killing of the dog (possibly to silence it); and the attempt to burn the house and the evidence it contained—all provide strong evidence of malice, premeditation, and deliberation.

On the record before us, it is not reasonably probable that, had trial counsel probed the prospective jurors concerning the matters listed above, the jury selected would have entertained a reasonable doubt concerning defendant's guilt or would have concluded that the special circumstance allegation was not true. Counsel's alleged failings in this regard are insufficient to undermine confidence in the outcome.

### D. *Alleged withholding of evidence at the preliminary hearing and deprivation of the right to a "continuous" preliminary hearing*

As noted above, the prosecutor learned on the evening of December 5, 1989 (the day before the preliminary hearing began), from interviews with Donna Guthrie and Maurice Solvang, of a plot to prevent Terry Guillory from testifying. Defendant asserts the prosecutor committed misconduct by failing

immediately to disclose that and related information[20] to the court and to defense counsel at or prior to the start of the preliminary hearing on the morning of December 6, 1989, and instead delaying disclosure until the noon recess on that date (following Guillory's testimony on direct examination that he heard gunshots, saw defendant peek out from the door of the Pillow home, and heard defendant "cuss" upon being observed by Guillory).[21] Defendant also asserts that this claimed misconduct in turn tainted his personal waiver of his right to a "continuous preliminary examination," which he had given at the start of the hearing, and subsequently forced him and his counsel to accept and seek later continuances (ultimately until January 21, 1990), all thereby violating his rights under section 861, subdivision (a).[22]

■ Assuming for purposes of analysis only that the prosecutor committed misconduct by failing to disclose this newly discovered information concerning the plot at the *commencement* of the preliminary hearing in the morning rather than during the noon recess and that the continuance violated defendant's right to a continuous preliminary hearing, defendant has not demonstrated entitlement to relief. As we held in *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941] (*Pompa-Ortiz*), when a defendant presents, by way of a pretrial writ petition, claims that establish irregularities in preliminary hearing procedures, the court will grant relief— for example, dismissal and remand for a new, properly conducted preliminary hearing—"without any showing of prejudice." (*Id.*, at p. 529.) But when such claims are presented for the first time on appeal, "irregularities . . . which are not jurisdictional in the fundamental sense shall be reviewed under the

[20] Solvang's detailed statement, which implicated defendant in the underlying killings, also asserted that Solvang himself had no intention of "killing" Terry Guillory, even though Solvang understood that defendant possibly was asking Solvang to do so. Solvang never testified at trial, however.

[21] The prosecutor asserted at the preliminary hearing, and the People claim on appeal, that the delay was necessary in order to protect the personal safety of Terry Guillory. But it is unclear how disclosure on the morning of December 6, at the commencement of the preliminary hearing, might have frustrated that goal. Indeed, it appears that the prosecution actually may have had a less altruistic motive, namely to elicit Guillory's incriminating statements for the record, prior to disclosing the plot information, out of fear that Guillory— already a reluctant witness—once aware of the plot, might refuse to testify or cooperate with the prosecution. Thus, the prosecutor, while simultaneously asserting that his delayed disclosure was "solely for the purpose of protecting [Guillory's] life," also candidly told the court: "I have a very great concern about Terry Guillory and his *willingness* and ability to appear in court to testify, and I, therefore, made the judgment that to protect that witness . . . after his direct examination we would then disclose to the defense the information that we now know about the defendant's efforts to suppress the testimony of Terry Guillory." (Italics added.)

[22] Defendant also asserts as an additional irregularity that a subsequent continuance, ordered because of the illness of the magistrate assigned to preside over the preliminary hearing, was improper because that judge failed to provide an affidavit attesting to his illness, in violation of the requirement, set out in Penal Code section 861, subdivision (a), of "good cause shown by affidavit."

appropriate standard of prejudicial error and shall require reversal only if the defendant can show that he was *deprived of a fair trial or otherwise suffered prejudice* as a result of the error at the preliminary examination." (*Ibid.*, italics added.) We observed that such an approach "is consistent with the United States Supreme Court's treatment of constitutional error at the preliminary examination. Thus, even in a situation as extreme as the denial of counsel, the U.S. Supreme Court has held that the harmless error rule is applicable." (*Id.*, at p. 530, citing *Coleman v. Alabama* (1970) 399 U.S. 1, 11 [26 L.Ed.2d 387, 90 S.Ct. 1999].) We held that although the defendant's statutory right to a public preliminary hearing had been violated—and the resulting commitment had been *"rendered unlawful* within the meaning of Penal Code section 995 " (*Pompa-Ortiz, supra,* 27 Cal.3d 519, 522, italics added)—the defendant was not entitled to relief, because he failed to show that he was subsequently deprived of a fair trial or was otherwise prejudiced by reason of the error. (*Id.* at p. 530.)

As defendant concedes, he presented none of his current challenges to the preliminary hearing procedures by way of a pretrial writ petition. Nor does he make any meaningful attempt to establish that he subsequently was deprived of a fair trial or otherwise suffered prejudice, as required by *Pompa-Ortiz, supra,* 27 Cal.3d 519. Instead, defendant asserts that the prosecutor's failure to earlier disclose the newly discovered evidence "amounted to deliberate, thoughtfully conceived, misconduct" that "should be treated as structural error," entitling him to relief without any showing of prejudice and without regard to whether the ultimate trial was fair.

As the high court held in *Arizona v. Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246], although most trial errors (including the denial of counsel at a preliminary hearing) are subject to harmless error analysis (*id.*, at pp. 306–308), *some* errors—those amounting to a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself" (*id.*, at p. 310)—are reversible per se, without inquiry into prejudice. Structural defects identified in *Arizona v. Fulminante* include: (i) "total deprivation of the right to counsel at trial"; (ii) trial by a "judge who was not impartial"; (iii) "unlawful exclusion of members of the defendant's race from the grand jury"; (iv) denial of the right to self-representation at trial; and (v) denial of the right to a public trial. (*Id.*, at pp. 309–310.)

Defendant offers no authority for the proposition that the errors or irregularities claimed here constitute structural defects warranting reversal per se, and we decline to endorse that position. Because defendant has failed to argue, much less demonstrate, that he subsequently was deprived of a fair

trial or otherwise suffered prejudice as a result of the asserted misconduct and asserted errors at the preliminary examination, he is not entitled to relief on appeal.

We reject for the same reasons defendant's related claim, asserted in cursory fashion in his reply brief, that trial counsel was constitutionally ineffective in failing to seek pretrial writ review concerning the "continuous preliminary examination" claim.

The record on appeal does not preclude a satisfactory explanation for counsel's actions, and hence provides no basis upon which to find deficient performance by trial counsel. (See *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *Pope, supra,* 23 Cal.3d 412, 426.) Moreover, even assuming deficient performance under an objective standard of professional reasonableness (*Strickland, supra,* 466 U.S. 668, 687–691; *Ledesma, supra,* 43 Cal.3d 171, 216–217), as suggested above defendant has not established prejudice, that is, a reasonable probability of a more favorable outcome in the absence of the assertedly deficient performance. (*Strickland, supra,* 466 U.S. 668, 691–696; *Ledesma, supra,* 43 Cal.3d 171, 217–218.) On the record before us, any assumed error by defense counsel in failing to seek writ review is insufficient to undermine confidence in the judgment.

### E. *Denial of court-ordered immunity for Maurice Solvang*

Defendant asserts that the trial court erred in failing to grant his motion (made during trial) seeking immunity for Maurice Solvang, thereby violating defendant's federal and state constitutional rights to a fair trial.

#### 1. *Facts underlying defendant's motion*

As noted above, on December 5, 1989—a day before the preliminary hearing began—the prosecutor and Inspector Sjostrand interviewed Donna Guthrie at her home and, finding Maurice Solvang there, briefly interviewed him at that time as well. Later that day, Solvang agreed to accompany the prosecutor and Sjostrand to the Richmond Office of the District Attorney, where Solvang submitted to a tape-recorded interview for approximately 90 minutes. In that interview, which was transcribed and made available to defendant (and was subsequently referred to and extensively quoted in defendant's midtrial motion seeking immunity for Solvang), Solvang described his contacts with defendant in the days prior to and after the killings. We set out below a summary of that interview.

At numerous times during the interview, Solvang recounted that, prior to the killings, defendant told him he hated his mother and his stepfather for

sending him to prison and that, in retribution, he planned to kill them. Solvang stated that on June 30, 1989—three days before the killings—Solvang advised defendant concerning how one would go about committing such homicides, including the killer's need to make sure that he was not seen by any witness, the need to dispose of any evidence, and the procedures necessary to create a gas leak in order to burn the home of his intended victims. In the course of this recitation, Solvang volunteered that in making such recommendations to defendant he was neither encouraging nor dissuading defendant, because he (Solvang) was "an impartial party" who reasoned, "if you're going to be stupid and do it, do it the smart way." He also asserted, however, that he did not believe that defendant actually would commit the planned crimes.

Solvang proceeded to explain that defendant told him how defendant obtained the gun used in the killings; that at Solvang's own recommendation, the two of them test-fired the gun; and that on July 2—two days before the crimes—Solvang went with defendant to purchase a box of bullets.

Solvang related that on July 5—the day after the killings—he and Donna Guthrie spent approximately four hours with defendant in a park, at which time defendant spoke to Solvang about the homicides and told him how he had killed each of the victims. Solvang stated he was uncertain as to of the number of bullets defendant said had been fired. Solvang recounted that defendant reported strangling the family dog with a vacuum hose because it would not stop barking after the gunfire ended, and that defendant had described looking out the front door and being noticed by Terry Guillory.

Solvang, revealing his and defendant's ingestion of drugs and alcohol for three days prior to the killings, described defendant's demeanor on July 5 as alternating between euphoria (at having killed Ardell) and depression (at the prospect of having no place to live), but showing no remorse. Solvang twice emphasized that while he and Donna Guthrie sat with defendant in the park, listening to him recount the crimes, he feared that defendant, who still was armed, also might kill him and Donna. Solvang speculated that defendant was "in a cloud of ecstasy" at the time he committed the crimes and did not know right from wrong.

Solvang related that he advised defendant to shed the clothing he had worn during the killings and drove with defendant and Donna to a store where defendant purchased new clothing. Solvang explained that while they were waiting for defendant to try on the new clothing, Donna told him (Solvang) that on July 3, defendant had telephoned her numerous times from the Pillow home, last calling about 11:30 p.m. and pleading, " 'If you don't come pick me up you'll read about it in the newspapers. I hope you feel great 'cause this is all your fault, it's your trip.' "

Solvang conceded having helped defendant discard his shoes and the gun, both of which, he claimed, defendant threw into a deep reservoir in his presence.

Solvang also admitted speaking with defendant by telephone numerous times in the months after defendant's arrest, and related that defendant had "made me several offers for Terry Guillory's life." Solvang explained that, in this regard, he had accepted from defendant a "$1,000 retainer" that was delivered to him in a cigarette box at a Foster's Freeze in El Sobrante. Solvang stated that although defendant did not specifically ask that Guillory be killed, it was clear to Solvang that defendant wanted Guillory's "termination," which Solvang assumed meant that Guillory was to be killed. Solvang, however, asserted that he never intended to kill Guillory, but instead viewed the retainer as "free money," which he used to purchase gifts and food for Donna Guthrie (who, by this time, was Solvang's girlfriend—and who, further complicating matters, also had a "long-standing relationship" with Terry Guillory).

During the interview, Solvang expressed concern that he might be prosecuted for his involvement in the events he was relating. Inspector Sjostrand replied that if Solvang in fact had destroyed evidence or assisted defendant after the killings, "that's something you're going to have to address." Finally, Solvang acknowledged having suffered three prison terms for numerous crimes, including smuggling narcotics, shooting a dog, and (in his words) "robberies, robberies, robberies, robberies."

Evidence adduced at the hearing on defendant's motion for court-ordered immunity for Solvang revealed the following.

Approximately one month prior to the December 5, 1989, interview described above (on November 4, 1989), Solvang had been charged with a misdemeanor, brandishing a firearm. On December 7, 1989, a police officer reviewing the original November report obtained Solvang's criminal records and on that basis modified the charges to include the additional felony charge of "felon in possession of a firearm." There is no indication that the modification was made at the behest of the district attorney's office. A subsequent police report entry in February 1990 indicated that the police would "take this case to D.A. review." Still later, a police report entry stated: "This case has been reviewed by the D.A. and a felony complaint issued."

Solvang had been subpoenaed by the prosecution to testify at defendant's preliminary hearing, which commenced on December 6, 1989. But thereafter Solvang was provided appointed counsel who advised him concerning his Fifth Amendment privilege against self-incrimination. Solvang was not subsequently called to testify at the preliminary hearing, apparently because he had

demanded "transactional immunity," which, the prosecutor later explained at a February 1990 hearing, he was "not prepared to offer."

Counsel for defendant learned of Solvang's December 5, 1989, interview shortly after noon on December 6. Soon thereafter, Craig Rock, the defense investigator, attempted at various times to interview Solvang. Ultimately Solvang agreed to an interview with Rock on July 26, 1990. At that interview, Solvang first stated that he "knew he had AIDS." Solvang also stated he had been subpoenaed by the prosecution to testify at defendant's trial and would do so if he received "user immunity from the D.A." Solvang further asserted he "would state that his previous statement to the D.A. regarding [defendant's] involvement in the killings was a lie" and that defendant "was an innocent witness to a robbery and the killings." Rock testified: "When I asked him how he knew this, was he present at the killings, he said 'possibly.' I then asked him if he did the shootings to which he again said 'possibly.' I asked him if he knew about a bracelet that was left at the crime scene. He asked me if I meant the one belonging to Donna. He then said we should check for her fingerprints on the wine bottle and on a pair of sunglasses. [¶] [Solvang] said that he and Donna had gone their separate ways" and that in the past he had had "a sexual relationship with Donna but not while [defendant] was going out with her."

Later, Solvang agreed to another interview with Rock, held on September 12, 1990. While Rock was driving Solvang to the office of defendant's counsel for that interview, and as they neared that office, Solvang noticed the prosecution investigator, Sjostrand, traveling in the opposite direction, and shared that observation with Rock. At the September 12 interview with Rock and defense counsel, counsel began by telling Solvang he "wanted to know what really happened on the night of the killings." Solvang responded he would demand immunity in order to testify at defendant's trial. Solvang asserted that the prosecution had told him that "somebody else must be involved [in the killings] because these victims didn't wait in line to be shot" and that if Solvang helped the prosecution, Donna would not be prosecuted, nor would he "unless he did the actual killings." Solvang asked defense counsel whether the public defender's office would represent him (Solvang) if the weight of the evidence shifted to him, and counsel responded that in that circumstance a conflict would be declared and Solvang would receive another court-appointed attorney. Solvang asked "why should a person be punished for something he didn't do?," adding "I don't want to see [defendant] get what they, the D.A., wanted him to get." Solvang then mused: "If me and two friends go to a house and I see valuable items and things get out of hand you got to terminate certain people. People with you have to decide whether they're going to be a witness against the person."

Later, Rock testified, Solvang mentioned that he " 'never saw this lady [Gloria Pillow] until . . . .' " Rock explained that Solvang did not finish the sentence. Rock further stated Solvang told him that after the killings, "Donna was going around telling people that [Solvang] was the one who did the killings." Solvang also said that he saw Terry Guillory with a $1,000 check, apparently from a newspaper's witness reward program, provided for having "turned in" defendant, and that Guillory had purchased drugs from Donna with that money. Solvang further stated that he also had given Donna the $800 he had received from the cigarette package delivered by defendant's friend Jackie. Solvang explained that Donna "has a way of wrapping men around her finger." Finally, Solvang asserted that at one point Guillory demanded that Donna share the $800 with Guillory, and that Inspector Sjostrand happened to have arrived while Guillory was making this demand. After the September 12 interview, Rock served Solvang with a subpoena to testify for the defense at defendant's trial.

Immediately after Solvang's September 12 interview, when Rock returned Solvang to his home, Donna—who at that time resided at the same location— angrily confronted Solvang, claiming Solvang was "out to get" her. Donna then telephoned the police to report a charge of "disturbing the peace," a violation of section 415. The San Pablo police responded. Upon interviewing Solvang, the investigating officer discovered that Solvang had two outstanding warrants. Based upon those warrants, Solvang was transported to the San Pablo Police Department, booked, and then transported to the Contra Costa County Jail.

Investigator Rock testified that, within two weeks of March 1991 (just prior to the beginning of jury selection in defendant's trial) he was led to believe by the prosecution that it planned to call Solvang as a witness at defendant's trial and that the prosecution had secured a "removal" order for the transportation of Solvang from the prison where he was then confined. But, Rock testified, when he checked he found that the prosecution in fact had not sought a removal order. Accordingly, defense counsel was required to seek such an order for Solvang's removal. Rock also testified that during defendant's trial—on March 27, 1991, the day before the immunity motion at issue was filed and heard—Rock spoke to Solvang, who advised him that he (Solvang) would exercise his Fifth Amendment privilege to decline to testify at defendant's trial. Rock did not ask Solvang why he would elect to exercise that privilege, and Solvang did not indicate why he had made that decision.

The parties stipulated that if called to the stand at defendant's trial, Solvang would assert his Fifth Amendment privilege against self-incrimination and would refuse to testify "absent a grant of immunity from the District Attorney."

## 2. *Defendant's motion for court-ordered immunity*

On March 28, 1991, during the presentation of the defense case at trial, defendant requested that the trial court grant immunity to Solvang. Citing *People v. Hunter* (1987) 49 Cal.3d 957, 974 [264 Cal.Rptr. 367, 782 P.2d 608] (*Hunter*), *In re Martin* (1987) 44 Cal.3d 1, 29 [241 Cal.Rptr. 263, 744 P.2d 374] (*Martin*), and *Government of Virgin Islands v. Smith* (3d Cir. 1980) 615 F.2d 964, 972 (*Smith*), defendant asserted in his motion that the court should grant Solvang immunity in order to redress the prosecution's asserted interference with defendant's right to present exculpatory evidence in his defense and to ensure defendant's right to a fair trial.

The trial court, in denying the motion, observed that many courts—including this court (see *Hunter, supra,* 49 Cal.3d 957, 973)—have recognized that the power to confer immunity is granted by statute to the executive, that is, to the prosecution (see § 1324), and have questioned whether a trial court possesses inherent authority to grant such immunity. Indeed, addressing this question in *People v. Lucas* (1995) 12 Cal.4th 415 [48 Cal.Rptr.2d 525, 907 P.2d 373], our court characterized as "doubtful" the "proposition that the trial court has inherent authority to grant immunity." (*Id.,* at p. 460; see also, e.g., *Carter v. United States* (D.C. 1996) 684 A.2d 331, 338–339 [citing and agreeing with "the overwhelming number of courts . . . that have rejected the concept of *judicially imposed* immunity," and noting that " 'there is considerable force to the Government's apprehension that defense witness immunity could create opportunities for undermining the administration of justice by inviting cooperative perjury among law violators' "].) Nevertheless, in *Lucas* as in *Hunter* and other cases (*In re Williams* (1994) 7 Cal.4th 572, 610 [29 Cal.Rptr.2d 64, 870 P.2d 1072] (*Williams*); *People v. Cudjo* (1993) 6 Cal.4th 585, 619 [25 Cal.Rptr.2d 390, 863 P.2d 635] (*Cudjo*)), we proceeded to assume that such inherent judicial authority exists and to address whether the defendant met the stringent requirements described in *Hunter* and *Smith* under which such relief conceivably might be warranted. The trial court in the present case undertook this same approach in considering (and ultimately denying) defendant's motion for court-ordered immunity. Following that same approach here, we conclude that *assuming* the trial court possessed authority to order transactional or use immunity for Solvang, the court did not err in failing to do so on the facts of this case.

We acknowledged in *Hunter, supra,* 49 Cal.3d 957, that it was "possible to hypothesize cases" in which "a judicially conferred use immunity might possibly be necessary to vindicate a criminal defendant's rights to compulsory process and a fair trial." (*Id.,* at p. 974.) We reviewed "the one case which has clearly recognized" such authority—*Smith, supra,* 615 F.2d 964—and highlighted two " 'clearly limited' " circumstances (both articulated in

*Smith*) in which judicially conferred use immunity might be constitutionally necessary. (*Hunter, supra*, 49 Cal.3d at p. 974.)

The first of the two tests outlined in *Hunter, supra,* 49 Cal.3d 957, would recognize the authority of a trial court to confer immunity upon a witness when each of the following three elements is met: (1) " 'the proffered testimony [is] clearly exculpatory; [(2)] the testimony [is] essential; and [(3)] there [is] no strong governmental interest[] which countervail[s] against a grant of immunity.' " (*Id.* at p. 974, citing *Smith, supra,* 615 F.2d 964, 972.)[23]

The trial court declined to make an express finding on the first element of this test, but, the People assert, necessarily made implied negative findings on either the second or third element (or both) of this test. Upon review, we conclude that defendant has failed to carry his burden of establishing the third element of this first test outlined in *Hunter, supra,* 49 Cal.3d 957. (See *Williams, supra,* 7 Cal.4th 572, 603 [defendant has burden of establishing alleged interference with his right to compulsory process for obtaining witnesses].)

The evidence presented at the hearing on the motion suggested that Solvang had given directly contradictory statements to the police and to the defense investigator regarding the events of the crime. His statements to the defense suggested that Solvang himself may have been the killer—and if that were true, there certainly would have been a strong governmental interest in not granting Solvang immunity (either "transactional" or "use") from prosecution. Moreover, even under the version of the facts related in Solvang's statement to the police, Solvang himself may have been guilty as an aider and abettor of the homicides, in that he admitted that, prior to the killings, he had given advice to defendant that would facilitate the commission of the murders. Under these circumstances, the prosecution reasonably would have been skeptical concerning which (if either) of Solvang's versions of the events was true.

Contrary to defendant's assertions, even a grant of use immunity would have substantially burdened the People. Had such immunity been conferred, at any later prosecution of Solvang in connection with the homicides at issue in this case the district attorney would have been forced to prove that the evidence offered was not obtained or derived from Solvang's immunized testimony at defendant's trial. (See *People v. Cooke* (1993) 16 Cal.App.4th

---

[23] The court in *Smith* cautioned: "[T]he defendant must make a convincing showing sufficient to satisfy the court that the testimony which will be forthcoming is both clearly exculpatory and essential to the defendant's case. Immunity will be denied if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or it is found to relate only to the credibility of the government's witnesses." (*Smith, supra,* 615 F.2d 964, 972.)

1361, 1370 [20 Cal.Rptr.2d 506].) Moreover, conferral of such immunity would have facilitated perjury by Solvang, who had shown himself to be of questionable veracity (*id.*, at p. 1371), and at the same time it would have substantially limited the prosecution's ability to conduct a full and free-ranging cross-examination of Solvang at defendant's trial (so as to narrow the scope of testimony that Solvang later might claim had tainted any subsequent prosecution). Based upon these considerations, and given Solvang's apparent complicity and culpability, the prosecution clearly had a strong governmental countervailing interest in not granting him either use or transactional immunity.

The second of the two tests referred to in *Hunter, supra,* 49 Cal.3d 957, as authorizing a trial court to grant immunity to a defense witness, would recognize such authority when "the prosecutor intentionally refused to grant immunity to a key defense witness for the purpose of suppressing essential, noncumulative exculpatory evidence," thereby distorting the judicial factfinding process. (*Id.,* at p. 975; see *Smith, supra,* 615 F.2d 964, 969 [inquiring whether prosecution acted "with the deliberate intention of distorting the factfinding process"]; see also *United States v. Westerdahl* (9th Cir. 1991) 945 F.2d 1083, 1086–1087 (*Westerdahl*) [defense-requested immunity should be granted when the defense witness would provide relevant testimony and the prosecution intentionally has distorted the factfinding process, which may be shown when the government relies heavily upon the immunized testimony of a government witness while denying immunity to a defense witness whose testimony would directly contradict that of the government witness].) The trial court implicitly found that this test was not met here.

There is no doubt that Solvang's testimony would have been relevant. But defendant has not met his burden of establishing that the prosecution's treatment of Solvang constituted an intentional distortion of the factfinding process with reference to (i) the upgrading, at the recommendation of the Richmond police, of Solvang's November 4, 1989, misdemeanor firearm charge to a felony charge; (ii) the arrest, by the San Pablo police, of Solvang on outstanding warrants shortly after his September 12, 1990, interview with the defense team; and (iii) the prosecution's refusal to grant immunity to Solvang, while granting limited immunity to other witnesses.

Contrary to defendant's speculation that the prosecution orchestrated the upgrading of the November 4, 1989, firearms charge against Solvang two days after obtaining a detailed statement from Solvang largely incriminating defendant, there is no evidence that the prosecution prompted the Richmond police to reevaluate and upgrade the November 4, 1989, misdemeanor firearms charge. The record reveals instead that a Richmond detective sergeant, while "reviewing reports that had been submitted to him . . .

recognized the name of Maurice Solvang as a person who may have been a convicted felon and . . . did some checking to determine that in fact . . . Solvang was a convicted felon and . . . on that basis he modified the charges . . . to reflect . . . the additional charge of felon in possession of a firearm."

Also, contrary to defendant's speculation that the prosecution arranged to have Solvang arrested in retaliation for his September 12, 1990, interview with the defense team, the evidence presented at the hearing on the immunity motion neither established nor reasonably implied any such connection, and suggested instead that Solvang's arrest immediately following his September 12 interview was the direct result of Donna Guthrie's disturbing the peace complaint, the investigation of which, by the San Pablo police, disclosed the existence of two warrants for Solvang's arrest.

Finally, contrary to defendant's speculation that the prosecution sought to pressure and punish Solvang after learning of his September 12, 1990, interview with the defense by refusing to grant him immunity while granting immunity to other witnesses, the record shows that beginning at the December 6, 1989, preliminary hearing, the prosecution consistently had declined to grant Solvang immunity. Although the prosecution granted very limited use immunity to witnesses Coghlan and Guillory, the People did not rely "heavily" upon immunized testimony (cf. *Westerdahl, supra,* 945 F.2d 1083, 1087) in proving their case. We find no support for the hypothesis that the prosecution changed its position concerning the propriety of immunity for Solvang in response to his September 12, 1990, interview with the defense team.

Accordingly, we conclude that defendant has failed to satisfy the second test referred to in *Hunter, supra,* 49 Cal.3d 957, 975, which potentially authorizes a trial court to grant immunity to a defense witness when the prosecution has acted with the deliberate intention of distorting the factfinding process. (See *Smith, supra,* 615 F.2d 964, 969; *Westerdahl, supra,* 945 F.2d 1083, 1086–1087.)

 Defendant also asserts a general claim of interference with his right to compulsory process for obtaining witnesses. (See *Martin, supra,* 44 Cal.3d 1, 29–32; *Williams, supra,* 7 Cal.4th 572, 603–609.) To demonstrate such a violation, defendant is required to establish, among other things, (i) prosecutorial misconduct—that is, "activity that was wholly unnecessary to the proper performance of [the prosecution's] duties and was of such a character as 'to transform [a defense witness] from a willing witness to one who would refuse to testify,' " and (ii) interference with the factfinding process—that is, "a causal link between the misconduct and [the defendant's] inability to present witnesses on his own behalf." (*Martin, supra,* 44 Cal.3d at p. 31; *Williams, supra,* 7 Cal.4th at p. 603.)

In this regard, the trial court stated: "I'm not persuaded that there has been anything that the District Attorney or the police agencies have done which constitutes misconduct; that is to say, a governmental interference with the defendant's [Sixth] Amendment right to produce witnesses. [¶] This is not a situation where Solvang was some kind of a willing defense witness who was transformed into one who has refused to testify. It's not a situation where a witness has been arrested outside of the courtroom in the presence of other witnesses. There simply has been no showing that prosecution intimidation was a substantial cause of Solvang's present refusal [to testify on Fifth Amendment grounds]." The trial court then speculated that perhaps Solvang presently was refusing to testify because he himself was fearful of retaliation by defendant.[24] The court concluded that, in any event, "there's been no connection between what may have been revealed to [the defense team] on July 26, 1990, and September 12th, 1990, no showing that [the] prosecution was aware of any of that, that might somehow provide the basis for an inference that Solvang's arrest was an effort to threaten or intimidate him."

We find the trial court's conclusions adequately supported by the record. The trial court did not err in denying defendant's motion for court-ordered immunity.

### F. Refusal to instruct the jury as to Solvang's invocation of his Fifth Amendment privilege, or the prosecutor's sole authority to grant immunity

As noted above, Solvang's name frequently was mentioned in the course of evidence that properly came before the jury: The record showed that Solvang collected $800 that apparently was designed to deter Terry Guillory from testifying, and that Solvang was present at Donna Guthrie's home on the evening prior to the preliminary hearing and spoke with defendant, who asked Solvang, "Anything ever work out?"—an apparent reference to the status of the effort to prevent Guillory's testimony. In addition, Inspector Sjostrand testified that, based upon information supplied by Solvang, the prosecution searched unsuccessfully in a deep reservoir or pond for defendant's bloodstained shoes and the murder weapon.

Also as noted above, the parties stipulated, outside the presence of the jury, that if Solvang were called to testify he would exercise his Fifth Amendment privilege to decline to do so. Defendant expressed concern that because of Solvang's assertedly high profile in the prosecution's case against him, the

---

[24] Contrary to defendant's suggestion, this speculation by the trial court does not conflict with the parties' stipulation that, if called to testify, Solvang would refuse to do so based upon his Fifth Amendment privilege. As the People observe, "a refusal to testify based upon the Fifth Amendment privilege is not mutually exclusive of a refusal for fear of [defendant]."

jury might infer from Solvang's absence at trial that if Solvang were to testify, he would provide further evidence unhelpful to defendant. Accordingly, defendant made a motion requesting the trial court to instruct the jury that it should draw no inference from Solvang's invocation of the privilege against self-incrimination.[25] Defendant relied upon Evidence Code section 913, which provides: "(a) If in the instant proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding. [¶] (b) The court, at the request of a party who may be adversely affected because an unfavorable inference may be drawn by the jury because a privilege has been exercised, shall instruct the jury that no presumption arises because of the exercise of the privilege and that the jury may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding."

The trial court denied defendant's motion, concluding that because there was no evidence before the jury that Solvang had exercised his Fifth Amendment privilege, and because the jury would be instructed, pursuant to CALJIC No. 2.11, that "[n]either side is required to call as a witness all persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events," defendant had no right to the proposed instruction.

Defendant acknowledges in his reply brief that we have held in previous decisions that no error results from a trial court's refusal to advise a jury that an individual's failure to testify was due to his or her invocation of the Fifth Amendment privilege against self-incrimination. (See, e.g., *Cudjo, supra,* 6 Cal.4th 585, 619–620, and cases cited.) Although defendant asserts those decisions "should be revisited," we see no reason to do so.

The prosecutor, arguing against defendant's motion, aptly observed that defendant essentially was asking that the jury be told, "Here's something irrelevant [under Evidence Code, section 913, subdivision (a)] . . . . Now that I've told you about, it, don't consider it." On appeal, the People assert, "[i]f the jury has never been told [or observed] that the privilege has been exercised, then there is no possibility that an 'unfavorable inference may be

---

[25] Alternatively, defendant asked that the following stipulation be made in the presence of the jury: "It is stipulated that the defendant in this case called Maurice Solvang as a witness. Mr. Solvang refused to testify to any matter, relying on the constitutional privilege against self-incrimination. You must not draw from the exercise of such privilege any inference as to the believability of the witness or as to the guilt or innocence of the defendant."

drawn by the jury because a privilege has been exercised.' " We agree that under the circumstances presented, Evidence Code section 913, subdivision (b) did not afford defendant a right to the instruction he sought.

In any event, there is no reasonable probability that the result in this case would have been different had the requested neutralizing instruction been given. As recounted above (pt. II.C.), the evidence of defendant's guilt was very strong. On this record, we agree with the People that "even if the jury were to speculate why the defense did not call Solvang as a witness and to speculate further that the defense had failed to call him because he might provide further damaging evidence to [defendant], such speculation would [have been] only consistent with the uncontradicted affirmative evidence of record that Solvang was involved with [defendant's] plot to suppress Guillory's testimony and that Solvang had other information about tangible evidence that might be damaging to [defendant]."

Defendant also asserts that even if no instruction pursuant to Evidence Code section 913, subdivision (b) was required, comments made by the prosecutor during closing argument required the court to instruct the jury that only the prosecution possessed the power to confer immunity in order to compel the testimony of a witness. For the reasons set forth below, we again disagree.

During the defense closing argument, defense counsel questioned Terry Guillory's testimony that Guillory had seen defendant peek out from the Pillow home on the night of the killings. In the process of making that point, counsel referred to "Kennie Bryant." Guillory claimed he had spoken to Bryant on July 4, 1989, and had told him that he had seen defendant at the Pillow home on the previous day. Counsel asked: "Kennie Bryant, where's Kennie Bryant? If there's any question about the veracity of Terry Guillory . . . then bring in Kennie Bryant."

In response to this defense argument that the prosecution had failed to call "Kennie Bryant" as a witness, the prosecution subsequently asserted in its rebuttal argument: "And by the way, folks, it's not a one way street. If there was anything there that defense counsel suggests was inconsistent in the statements of those witnesses made to the police officers on the Fourth of July, they can call them. If Kenneth Bryant—if the defense thinks that Kenneth Bryant is going to impact on this testimony—." At that point defense counsel objected "in light of the record in this case." The court noted the objection, and the prosecutor continued: "[I]f Kenneth Bryant has anything to offer that in any way contradicts what Terry Guillory said, he's available to the defense as much as he is to us." Shortly thereafter, defense counsel interjected, "Your Honor, I'm going to have to ask the Court to instruct on

who grants immunity." The court responded that it would consider that request later, prior to instructing the jury. The prosecutor continued with his argument: "If Kenneth Bryant is available—he's as much available to the defense as he is to us, make no mistake of it. So you can't infer from the suggestions of defense counsel that somehow because a witness wasn't called, that means the People have something to hide. Because not only is that not fair, it's not accurate."

At the subsequent hearing on the defense motion for an instruction advising the jury that the prosecution possessed the sole authority to confer immunity, the prosecutor asserted that his challenged comments concerning Kenneth Bryant did not warrant such an instruction, because those comments had been "very specifically directed to a very specific suggestion by defense counsel [as to] why the People didn't call Kenneth Bryant since this was the first [person to whom] Terry Guillory said he saw [defendant peeking] out the door. I very specifically responded [that] Ken Bryant was as much available to the defense as he was to the prosecution. My comment went no further than that." The court agreed, noting, "I'm not aware of any claim of privilege by that person [Kenneth Bryant]." Indeed, defense counsel conceded that there was no such claim concerning Bryant, but suggested nevertheless that an instruction specifying the prosecution's sole authority to confer immunity would "clear up misapprehension in the minds of the jurors." The court responded that it had understood counsel's argument, but that it would not further instruct concerning the power to confer immunity.

Defendant now claims that the prosecutor's rebuttal argument was designed to, and was likely to, mislead the jury into believing that defendant easily could have produced *Solvang's* testimony if defendant thought that doing so would assist him, and that the absence of defendant's requested instruction invited the jury to speculate that Solvang's testimony would only harm defendant, by confirming that indeed he had accepted money to keep Terry Guillory from testifying. But neither the language used by the prosecutor, nor the context in which the words were uttered (a response to specific charges made by defense counsel concerning Kenneth Bryant) suggests any attempt by the prosecutor to imply that the defense could have called Solvang as a witness and compelled him to testify. Moreover, as noted above, the properly admitted evidence—(i) from witness Jacqueline Coghlan, concerning the cash delivery from defendant to Solvang; (ii) concerning the telephone conversation that Inspector Sjostrand recorded on the eve of the preliminary hearing, in which defendant asked Solvang, "Anything ever work out?"; (iii) concerning defendant's letter to Donna in which he referred to "the cookie" (a reference to Guillory) and told Donna to "[r]emind me when I talk to you to explain to you how one little mess can be cleaned"; and (iv) from Inspector Sjostrand, concerning Solvang's tip relating to the possible location of the murder weapon—considered as a whole, provided the jury with an

ample basis upon which to infer that Solvang in fact had accepted money as part of a plot to silence Terry Guillory, and that Solvang learned of the disposal of the murder weapon from his contacts with defendant. Accordingly, even if the jury were to have speculated from Solvang's absence that his testimony might have been unfavorable to defendant in these respects, the evidence properly before the jury already provided an independent and strong basis for the jurors to reach these same conclusions. We agree with the trial court's determination that no special instruction concerning the prosecution's exclusive authority to confer immunity was required under these circumstances, and further conclude that, in any event, there is no reasonable probability that the result in this case would have been different had the requested instruction been given.

Finally, we also reject defendant's cursory argument, presented in a footnote, that his federal constitutional rights to confront and cross-examine the witnesses against him were violated by the trial court's refusal of the requested instructions. Relying upon *Namet v. United States* (1963) 373 U.S. 179 [10 L.Ed.2d 278, 83 S.Ct. 1151], defendant asserts that such a constitutional violation occurred because, he claims, "critical weight" was added "to the prosecution's case in a form not subject to cross-examination." (*Id.*, at p. 187.) In *Namet,* however, the high court did not adopt or endorse such a test. (*Ibid.*) Indeed, *Namet* expressly concerned only "a claim of evidentiary trial error" and "[n]o constitutional issues of any kind." (*Id.*, at p. 185.) In any event, we cannot conclude that any inference that the jury may have drawn from Solvang's failure to testify added "critical weight" to the prosecution's case because, as explained above, the facts that the jury might have inferred from Solvang's failure to testify—for example, that indeed he had participated in a plan created by defendant to prevent Terry Guillory's testimony, and that he had knowledge, gained from defendant, concerning the location of the murder weapon—were already the subject of independent and strong evidence at trial, and hence any inference drawn from Solvang's failure to testify did not provide "critical weight" to the prosecution's case.

## G. *Proof of defendant's status as a felon*

Count 4 of the information charged defendant with being a felon in possession of a firearm (§ 12021), specifically identifying the applicable prior felony convictions as attempted robbery, automobile theft, receiving stolen property, forgery, and possession of a firearm by a felon.[26] In response to

---

[26] At the time of the offense, section 12021 prohibited a felon from possessing a concealable firearm, but the section now prohibits a felon from possessing any firearm, concealable or not. (See Stats. 1989, ch. 254, § 1, p. 1297.) This element of the offense is not relevant to any issue raised on appeal, and thus, for convenience, we shall refer to the offense simply as possession of a firearm by a felon.

defendant's objections to the court's plan to read to the jury the multiple prior felony convictions alleged in count 4, and defendant's offer to "stipulate to a conviction of receiving stolen property," the prosecution at first argued that it should be permitted to offer evidence of all prior felony convictions incurred by defendant, in order to guard against the possibility that the jury might find that one or more of these convictions were not properly proved. Ultimately, however, the prosecution offered to stipulate that (i) on July 4, 1989, defendant was "a convicted felon," or that (ii) defendant "had previously been convicted of a felony, as of July 4, 1989."

Defense counsel rejected both proposed stipulations and stated that, rather than leaving the jury with the impression that defendant previously had been convicted of an "[e]gregious" felony or an unspecified felony "without explanation," counsel would prefer that the jury hear that defendant previously had been convicted of the specific felonies listed in count 4. The prosecution responded that it intended to introduce several letters that defendant had written to his mother while he was in prison in order to show defendant's motive for killing his mother and Ardell, and noted that these letters referred to defendant's having been sent to prison for a theft-related offense and for having been a felon in possession of a firearm; hence, the prosecution asserted, much of the information identifying defendant's prior conviction properly would come to the jury's attention in any event.

In the absence of a stipulation, the trial court ruled that count 4 would be read to the jury, listing the five felonies, and the court thereafter read that count to the jury. At trial, the prosecution introduced evidence, contained in two abstracts of judgment, of defendant's conviction of three nonviolent felonies alleged in count 4. The abstracts showed that defendant was sentenced to prison for receiving stolen property, fraudulent use of a credit card (forgery), and for being a felon in possession of a firearm. Defendant objected to introduction of the abstracts and a related packet of certified prison documents (a fingerprint card, a mug shot, and a chronological history), asserting that these latter documents contained irrelevant and unduly prejudicial information. Overruling the objections, the court admitted the two abstracts of judgment and the challenged certified prison records.

On appeal, defendant initially asserts that the trial court erred in two respects: (1) by failing to force the prosecution to accept defense counsel's offer to stipulate that defendant had been convicted of the prior felony of receiving stolen property, thereby obviating the need for proof of the prior felony element of the charged offense of being a felon in possession of a firearm, and (2) by failing to confine the evidence of defendant's prior felony status to only one of the prior felonies listed in count 4.

Defendant concedes that under California Constitution article I, section 28 and *People v. Valentine* (1986) 42 Cal.3d 170, 173 [228 Cal.Rptr. 25, 720 P.2d 913], a jury must be advised of a defendant's felon status when that status is (as under section 12021) an element of the current charge. We noted in *Valentine* that when a defendant stipulates to his or her felon status, "evidence of the *nature* of his prior convictions . . . may and should be withheld from the jury" because "such evidence is irrelevant" to the issue of one's status as a felon. (42 Cal.3d at p. 173; accord, *Old Chief v. United States* (1997) 519 U.S. 172 [136 L.Ed.2d 574, 117 S.Ct. 644] [defendant's offer to stipulate to felon status in prosecution for being a felon in possession of a firearm must be accepted by trial court].) Here, however, defense counsel *refused* to stipulate generally to his client's felon status, out of concern that the jury might assume that the unspecified felony was considerably more egregious than the convictions that defendant actually had suffered. For this reason, the present case is distinguishable from both *Valentine* and *Old Chief*. Indeed, counsel went so far as to state that instead of stipulating to unspecified felon status, he would prefer that the jury hear the actual list of "all" prior felonies alleged in count 4—which is exactly what ultimately occurred in this case.

On this record, we do not perceive any error on the part of the trial court. Even if we were to assume that the trial court did err, however, any such error was plainly nonprejudicial. As the prosecutor noted early in the hearing on defendant's motion, some of the circumstances related to defendant's prior felony convictions—specifically, the fact that defendant had been imprisoned for a theft-related offense (involving coins and a gun belonging to Ardell) and for being a felon in possession of a firearm—would have been disclosed to the jury in any event, through other evidence (namely, defendant's letters to his mother, introduced to establish motive, and defendant's admission to Mary Perron that he had been caught with a gun, a violation of his probation). Most of the felonies listed in count 4 were nonviolent crimes (as noted, all three of the proved prior felony convictions were nonviolent)—and all paled in comparison with the crimes and facts underlying the charges in the present case. Finally, a limiting instruction (CALJIC No. 2.50) cautioned the jury not to consider the other-crimes evidence except as that evidence related to intent, identity, and motive—an admonition that the prosecution underscored at closing argument. Viewing the record as a whole, no reasonable probability exists that the verdict would have been different had the jury not been informed, as a basis for making its finding on the section 12021 charge, that defendant had suffered the felony convictions listed in count 4. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendant also asserts that the trial court erred in refusing to limit the prosecution's proof of his felony status to the abstracts of judgment, and in

instead allowing introduction of defendant's mug shot, fingerprint card, and chronological history contained in his state prison file.

The People assert, reasonably, that this information was relevant to establish defendant's identity as the same Richard Bert Stewart who had suffered the prior felony convictions described in the two abstracts of judgment. The chronological history set out in the prison documents was relevant to corroborate evidence contained in the letters sent by defendant from prison to his mother, by placing in perspective the timing of the letters and corroborating defendant's statements to the Pillows' neighbors (Perron and Powell) concerning defendant's motives for committing the crimes. In any event, for the reasons set out above, any error in this regard was nonprejudicial.

Finally, defendant asserts that his trial counsel performed in a constitutionally deficient manner by failing to reconsider and accept the prosecutor's proposed stipulation (that defendant "had previously been convicted of a felony, as of July 4, 1989") after defense counsel's own proposed stipulation (that defendant had been convicted of the felony of receiving stolen property) was rejected. The record makes it clear that in trial counsel's judgment there was a risk that the jury, if told only that defendant had suffered an unspecified prior felony conviction, might speculate that the prior felony was substantially more serious than the five felonies listed in count 4, three of which—all nonviolent—the prosecutor eventually established through the two abstracts of judgment. Because the record on appeal does not preclude a satisfactory explanation for defense counsel's actions (*Mendoza Tello, supra,* 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134]), we cannot conclude he made an unreasonable tactical choice and we shall not second-guess his decision. (*Pope, supra,* 23 Cal.3d 412, 426.) Accordingly, we conclude that defendant has failed to establish deficient performance under an objective standard of professional reasonableness. (*Strickland, supra,* 466 U.S. 668, 687–691; *Ledesma, supra,* 43 Cal.3d 171, 216–217.)

In any event, for the reasons set out above, defendant also has failed to establish prejudice, that is, a reasonable probability of a more favorable outcome in the absence of counsel's assertedly deficient performance. (*Strickland, supra,* 466 U.S. 668, 691–696; *Ledesma, supra,* 43 Cal.3d 171, 217–218.)

## H. *Introduction of photographs*

Immediately after the jury selection process was completed, defendant moved to exclude a number of relatively small (three by five inches) color photographs contained in People's exhibits 2 and 3, which the prosecution planned to introduce at the guilt phase of the trial. People's exhibit 2 was a

collection of 32 photographs fixed to a placard, showing the crime scene and the three bodies and the dog found dead at the scene. People's exhibit 3-A consisted of three autopsy photos of Gloria Pillow; People's exhibit 3-B consisted of six autopsy photos of Ardell Pillow; and People's exhibit 3-C consisted of four autopsy photos of Murray Lucas. Defense counsel objected to all of the autopsy photos set out in People's exhibit 3-A, -B, and -C, and most of the crime scene photos set out in People's exhibit 2.

The trial court stated that it had "carefully examined each of the numbered photograph[]s" in the two exhibits, and found each of them relevant to show defendant's "state of mind, premeditation, deliberation[], [and] intent to kill." The court agreed with defendant that three of the photos—one each in People's exhibits 3-A, -B, and -C—substantially replicated the same or a very similar photograph found in People's exhibit 2, and excluded those three photographs. The court concluded that the remaining photographs in the two sets of exhibits each had probative value that outweighed the potential for prejudice, and noted, "[t]hey are not terribly grotesque. They are, to be sure, not pleasant ones for viewing, but homicide cases don't lend themselves to pleasantness, and the objection will be overruled as to all except [the three redundant photos originally set forth in People's exhibits 3-A, -B, and -C]."

Defendant now asserts that the trial court abused its discretion in admitting most of the photographs described above, on the ground that they were gruesome, inflammatory, cumulative of each other or of testimony, and that he should have been allowed to stipulate to facts so as to avoid the presentation of photographs. Defendant also asserts that the probative value of the photos was outweighed by their prejudicial effect (Evid. Code, § 352), and that two of the photos set out in People's exhibit 2 depicting the dead dog were irrelevant and hence were admitted in violation of Evidence Code section 351. In sum, defendant claims, these asserted evidentiary errors violated his federal constitutional rights to due process of law and a fair trial.

We have reviewed the challenged photographs, and although we agree with the trial court that many of them are unpleasant, most are, given the subject matter, quite unexceptional. The least pleasant among them are no more unpalatable than photographs whose admission we have approved in other capital cases. (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 336–337 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Crittenden* (1994) 9 Cal.4th 83, 134 [36 Cal.Rptr.2d 474, 885 P.2d 887].) We agree with the trial court that each of the challenged photographs had probative value in proving contested issues at trial, such as defendant's use of a gun, state of mind, premeditation, and motive, and we perceive no basis upon which to conclude that the trial court abused its discretion in failing to exclude these photographs under Evidence Code section 352. (*People v. Scheid* (1997) 16 Cal.4th 1, 18 [65

Cal.Rptr.2d 348, 939 P.2d 748] [trial court's determination under section 352 will not be reversed " 'unless the probative value of the photographs clearly is outweighed by their prejudicial effect' "]; *People v. Crittenden, supra,* 9 Cal.4th 83, 133–134.)

Even if we were to agree with defendant that some of the challenged photographs were of limited probative value and should have been excluded by the trial court, any error in this regard clearly would be harmless. (See *People v. Allen* (1986) 42 Cal.3d 1222, 1258 [232 Cal.Rptr. 849, 729 P.2d 115].) As detailed above, the circumstantial evidence of defendant's guilt— the evidence linking him to the crimes, his motive for the killings, and his attempts, after committing the crimes, to alter and prevent testimony—made the case against him very strong. The challenged photographs admitted into evidence were in a small format and, in comparison with exhibits we have seen and approved in other cases, not unduly shocking or inflammatory. Under the circumstances, it is not reasonably probable that the jury would have reached a different result had the challenged photographs been excluded. (*People v. Watson, supra,* 46 Cal.2d 818, 836.)

### I. *Introduction of unredacted letters written by defendant*

When defendant was imprisoned on two occasions prior to the killings in this case, he wrote letters, some to his mother and others to both his mother and his stepfather, Ardell. At trial, the People offered seven of those letters, and they were admitted into evidence without objection, along with a stipulation that defendant wrote them. Defendant also wrote numerous letters to Donna Guthrie after the killings in this case, while he was in jail awaiting trial on the murder charges. The People offered one of those letters into evidence and, again without objection, it was admitted.

The seven letters detailed the deep distress and anger directed by defendant toward his mother and Ardell for their role in defendant's having been committed to prison, as well as his frustration with society—which, defendant repeatedly claimed, made him what he is. At the same time, the letters contained many expressions of defendant's love for his mother and Ardell, asked for their forgiveness, and expressed optimism and hope for his reformation. Viewed as a whole, the letters served the prosecution's purpose of documenting defendant's motive for the killings and his effort to silence Terry Guillory, but also served the interests of the defense, by humanizing defendant and showing him to be a fairly articulate, philosophical, and loving person at times.

Defendant asserts these unredacted letters contained "mostly irrelevant, inadmissible material that should never have been introduced to the jury."

Defendant argues that although the letters sent to his mother and Ardell were offered to establish his motive for the killings, and the letter to Donna was offered to establish the plot to prevent Terry Guillory from testifying, numerous passages and aspects of the letters were irrelevant for those purposes and only could have harmed defendant—and hence the letters should have been redacted.

Defendant cites various references contained in the letters to other crimes—including stealing Ardell's coins; fraudulent use of a Visa credit card; "appropriating someone's lost $300 check to make a down payment on a Cadillac"; alleged theft of a microwave oven; being "locked up" for various crimes since the age of 16 years or for "5 out of the past 8 years"; and defendant's "outlaw" past and "hundred dollar a day drug habit." Defendant also cites as irrelevant and prejudicial the following matters appearing in his letters: (i) a small swastika on one of the letters to his mother; (ii) references to defendant's "death wish" for his cousin, Gary Beach (who refused to perjure himself by testifying that defendant had not test-fired a .22-caliber gun); (iii) references to his girlfriend Billie having been featured in a "smut film" and also having fraudulently used Ardell's Visa credit card; (iv) defendant's alleged adoption of his father's cold moral code, "[t]he heart is just a liquid pump"; and (v) references to defendant's "controversial political views" that the jury might have inferred from defendant's discussion of property confiscation, interference with sexual freedoms, imprisonment for "victimless crimes," society's responsibility for crime, the ills of divorce, the need for birth control, and exploitation of prison labor. Finally, regarding the letter to Donna Guthrie, defendant cites as irrelevant and prejudicial his promise to engage in oral sex with Donna, defendant's reference to his study of the law, and again the small swastika appearing in his signature.

To the extent defendant asserts the trial court erred in failing to excise the passages that defendant now characterizes as either irrelevant or unduly prejudicial, the claim cannot properly be raised on appeal; defense counsel made no such objection at trial and instead stated he had no objection to admission of the letters.

Recognizing his trial counsel's failure to object, defendant asserts that counsel afforded him constitutionally deficient performance in this regard. As defendant concedes, much of the material in the letters—for example, his repeatedly professed love for his mother and Ardell, his asking for forgiveness, his promises to reform, and his philosophical musings—served to humanize defendant and paint a more complete picture of the emotionally tumultuous relationship between him, his mother, and his stepfather, Ardell. Indeed, and apparently for that reason, defense counsel, during his closing guilt-phase argument to the jury, repeatedly invited the jury to read *all* of

defendant's letters and criticized the prosecutor for failing to acknowledge one of the letters in which defendant expressed love for his mother. We therefore disagree with defendant's assertion that there could not have been any tactical explanation for trial counsel's failure to seek redaction of the letters. Reasonable counsel might well have concluded that in this case, in which defendant did not testify, allowing the jury to review the letters *in their entirety*, without certain passages blacked out (with redaction perhaps leading the jury to speculate that information especially harmful to defendant had been excised), conveyed to the jury an unvarnished and honest description that, on balance, might serve defendant well. Accordingly, because the appellate record does not preclude a satisfactory explanation for counsel's actions, we cannot find that counsel acted deficiently. (*Mendoza Tello, supra,* 15 Cal.4th 264, 266; *Pope, supra,* 23 Cal.3d 412, 426.) Instead, we conclude that defendant has failed to establish deficient performance under an objective standard of professional reasonableness. (*Strickland, supra,* 466 U.S. 668, 687–691; *Ledesma, supra,* 43 Cal.3d 171, 216–217.)

Defendant insists that defense counsel at least should have sought to eliminate from the letter to Donna Guthrie his offer of oral sex, and from that letter (and one other letter to his mother) the use of small swastikas to decorate his name. It is not apparent that, had the requests been made, the trial court would have abused its discretion had it declined to redact in the manner defendant now claims should have been done. The People assert that the reference to oral sex in the letter to Donna Guthrie was relevant and probative in that it served to demonstrate the intimate relationship between defendant and Guthrie, and hence show why he would confide in her concerning the details of his plan to prevent the testimony of Terry Guillory. The People also assert that the swastikas set out in the letter to Donna Guthrie were relevant and probative in explaining and placing in perspective defendant's apparent hatred of Guillory (who, as noted, is of mixed race), and defendant's disparaging references to Guillory as "the Oreo" or "cookie."

But even assuming that in one or both of these limited respects trial counsel performed deficiently by failing to request excision of the references to oral sex and to the swastikas, defendant fails to establish prejudice, that is, a reasonable probability of a more favorable outcome in the absence of the assertedly deficient performance. (*Strickland, supra,* 466 U.S. 668, 691–696; *Ledesma, supra,* 43 Cal.3d 171, 217–218.) On the record before us, it is not reasonably probable that, had trial counsel prevailed upon the trial court to excise the reference to oral sex or the two small swastikas that adorned two of defendant's letters, the jury would have entertained a reasonable doubt concerning his guilt, or would have concluded that the special circumstance allegation was not true. Counsel's alleged failings in this regard were wholly insufficient to undermine confidence in the outcome.

Finally, defendant asserts the prosecutor committed misconduct by referring at closing argument in the guilt phase of the trial to various aspects of the letters. For example, the prosecutor pointed out that while defendant was making sexual overtures to Donna Guthrie, whom he involved in his plan to eliminate the testimony of Terry Guillory, defendant was promising marriage to Jacqueline Coghlan, whom he also had enlisted in his plan concerning Guillory.[27] The prosecutor concluded that the jury should, based upon these circumstances, infer that defendant was manipulative. The prosecutor also drew attention to defendant's use of the swastikas in two of his letters, noting that it was a "universal sign of hatred." Referring to the passages showing defendant's anger at his mother and Ardell, the prosecutor commented that they suggested "just about the kind of state of mind you need to shoot three people in the head," and then remarked: "But if you are brought up—and people give you advice that you adopt—that the heart is nothing more than a liquid pump, then [killing three people is] not so tough; is it?" Referring to passages in the letters concerning defendant's discussion of "natural law" and various societal failings, the prosecutor commented, "It's all our fault, folks." Finally, referring to defendant's complaints concerning "victimless crimes," the prosecutor interjected, "Since when is grand theft [of Ardell's coins] a victimless crime?"

Defendant asserts that these comments disclose a pattern of prosecutorial "intemperate behavior" that deprived him of due process of law and a fair trial under the federal Constitution (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673] (*Hill*)) or that, under state law, amounted to the " ' " ' "use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*Ibid.*; *People v. Samayoa, supra,* 15 Cal.4th 795, 841.) Defendant asserts that the prosecutor's comments invited the jury to conclude that he was a "bad person," a racial bigot, and a "manipulator" of women and the legal system, and "therefore likely to have committed multiple murder." Defendant asserts that these comments violated accepted professional standards governing the conduct of prosecuting attorneys, and thus require reversal.

As defendant concedes, he failed to object to the challenged comments or to request curative admonitions, and we repeatedly have held that such failure bars presentation of a misconduct claim on appeal. (*People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*).) Contrary to defendant's view, we believe that a timely admonition, if appropriate, would have cured any perceived harm, and that a request for an admonition would not have been futile. But in any event, as a general matter the prosecutor's

---

[27] The prosecutor also observed that "[e]rotica from people in jail is not unusual and you certainly can't use anything like that as somehow suggesting that [defendant] is more likely guilty than not because he writes something like that and it's not offered for that."

statements were within acceptable bounds. (*Hill, supra,* 17 Cal.4th 800, 819.) Defendant *was* shown by the evidence to be a manipulator (who in large part blamed society for his failings), and it was clear as well that, at least at times, he was indeed quite hateful—an attribute that, under the circumstances, was highly relevant to defendant's motive and intent to kill. The challenged comments, viewed singly or cumulatively, did not amount to a miscarriage of justice. (*Green, supra,* 27 Cal.3d 1, 34.)

## J. *Evidence of a contract or plan to "kill" Terry Guillory*

The prosecution presented substantial evidence to establish that defendant plotted to prevent Terry Guillory from testifying. That evidence consisted of (i) the testimony of Jacqueline Coghlan, who explained how defendant had arranged for her to deliver $1,000 to Solvang, and that this money was designed to ensure that the person whom she knew as "the Oreo" (Guillory) would not testify concerning his having seen defendant at the Pillow home on the night of the killings; (ii) the testimony of Inspector Sjostrand, who described the tape-recorded telephone call made to Solvang from "Richard," in which the caller asked Solvang, "Anything ever work out?"; and (iii) defendant's letter to Donna Guthrie, mentioning that "the cookie" (Guillory) was "practically begging them to let him help try to hang me" but that Donna should "[r]emind me when I talk to you to explain to you how one little mess can be cleaned."

Although Coghlan stressed that the money was designed to "persuade" Guillory not to testify, or to "prevent" his testimony, she also asserted there was no plan to have Guillory killed. Nor was there any other evidence admitted to establish that the purpose of defendant's plot was to kill Guillory, rather than merely silence him by other means in order to ensure that he did not testify he had seen defendant peek out from the Pillow home on the evening of the killings.

Nevertheless, during the course of Guillory's testimony, a number of references were made, by the witness and by the prosecutor, to a contract or plan to "hit" (that is, kill) Guillory.

### 1. *References to a contract or plan to kill Terry Guillory*

The first such reference occurred during defense counsel's cross-examination of Guillory when, in response to a question by counsel, Guillory explained that he had been "pissed at them [the prosecution team] because they didn't tell me [earlier] that Richard" (defendant) had, from jail, "put a contract on my head." Subsequently, during the prosecution's redirect examination of Guillory, the following exchange occurred:

"[PROSECUTOR]: I think [it is] apparent to everybody in here you're not very happy this morning; are you?

"A. No, I hadn't had much sleep.

"Q. And you weren't real happy at the time you testified at the preliminary hearing, were you, either? Were you?

"A. No, I wasn't.

"Q. And during the time you were testifying at the preliminary hearing we, meaning myself and Mr. Sjostrand, disclosed something to you for the first time; didn't we?

"A. Yes, you did.

"Q. And what did we disclose to you?

"A. That there was a contract out on my head.

"Q. Put out by who?

"A. By Richard from the jail.

"Q. And did we explain to you who was involved in the putting out of that contract?

"A. I believe you did.

"[DEFENSE COUNSEL]: Your Honor, the jury should be admonished . . . that the questions are not evidence because we haven't, you know, it's a question of misleading the jury as to whether or not these facts are true or not.

"THE WITNESS: They're true.

"THE COURT: Counsel, instructions already [have] been given. Certainly if you wish a more focused instruction at a later point I'll entertain it.

"[DEFENSE COUNSEL]: Thank you.

"[PROSECUTOR]: Was the name Maurice Solvang brought up at that time?

"A. Yes, it was.

"Q. Were you informed by myself and Mr. Sjostrand that we had information that [defendant] had paid over a thousand dollars using his then girlfriend Jacqueline Coghlan for the purpose of making sure you didn't testify at the preliminary hearing?

"A. Yes.

"Q. And how did that make you feel?

"A. Very angry.

"Q. And who were you angry with?

"A. Everybody.

"Q. In fact you had a few choice words to say to me and Mr. Sjostrand; did you not?

"A. I sure did.

"Q. You felt that we didn't tell you soon enough; is that right?

"A. Yep."

A short while later, while Guillory continued to testify, defendant's plot to keep Guillory from testifying was described to the jury again as not merely a plan to keep Guillory off the witness stand, but also a scheme to kill him. The following exchange occurred:

"[PROSECUTOR]: Now, did you also describe for Mr. Sjostrand what your understanding had been in talking to a woman by the name of Pam who lived with Donna—

"A. Pat.

"Q.—at the time you were testifying at the preliminary hearing?

"A. Pat.

"Q. Pat, okay. And did you indicate to Mr. Sjostrand that it had been your understanding based upon your conversation with Pat that—

"[DEFENSE COUNSEL]: This is hearsay unless it's for state of mind, whatever.

"[PROSECUTOR]: Goes to the state of mind of this witness and can be limited to that.

"[DEFENSE COUNSEL]: Okay.

"THE WITNESS: When you guys came around Pat used the name of Donna. That's why Mr. Sjostrand didn't remember her name.

"[PROSECUTOR]: And what did Pat indicate to you about what your understanding was with respect to what was supposed to happen to you before you testified at the preliminary hearing?

"A. Um, rephrase that for me again please or say it again. What did Pat tell me?

"Q. Yes.

"[DEFENSE COUNSEL]: Hearsay.

"THE WITNESS: Well, Pat told me—. . . .

"[PROSECUTOR]: State of mind of the witness.

"THE COURT: Overruled.

"THE WITNESS: Pat told me that, uh, I was supposed to get hit. She asked me not to take Donna's daughter to Sacramento because I was supposed to be swimming in the river. Be set to be—I was being set up to go swimming in the river.

"[PROSECUTOR]: And by swimming in the river that meant what?

"A. Sacramento.

"Q. Swimming or floating?

"A. Floating. Nobody brought up Pat's name. She asked everybody to keep her out of it. Or she was staying with Donna for awhile and didn't want to talk about much but more—well, she didn't want to say everything she knew because she didn't want to get involved.

"[DEFENSE COUNSEL]: This is all hearsay. This is beyond.

"THE COURT: The last volunteered answer will go out. Next question, Mr. [prosecutor].

"[PROSECUTOR]: Mr. Guillory, did you ask to be a witness in this case?

"A. No, I did not.

"Q. Before the 4th of July 1989, was there any reason for you to provide some kind of damaging information against [defendant]?

"A. No.

"Q. Did you have any prior animosity towards him or any reason to do him wrong?

"A. No. Before he got out of jail I had never knew him. I really don't know him now, I didn't know him then.

"A. But before you talked to Officer Socorro Moreno on the 4th of July, was there anything about anything that you did know about [defendant] that would cause you to make any of this up—

"A. No.

"Q.—to make him look bad in some way?

"A. No.

"Q. How about the same thing with Donna Guthrie. Did you have any bad blood between you and Donna or her daughter to cause you to—

"A. No.

"Q.—to do her or friends of hers wrong?

"A. No.

"Q. And the first time that you learned that [defendant] had put a contract out on your life was just before you testified at the preliminary hearing, is that right?

"A. Yes.

"[PROSECUTOR]: Thank you. Nothing further.

"THE WITNESS: Well, actually it was just after I testified, started to testify, and they called a recess.

"[PROSECUTOR]: Okay. You were in the middle of your testimony at the preliminary hearing in fact?

"A. Before I found out.

"Q. Then you were brought back to the District Attorney's Office and did Mr. Sjostrand indicate to you that information was communicated to you based upon a conversation that he had had with Jacqueline Coghlan the night before? The night before the preliminary hearing?

"A. That's right.

"Q. So it was told to you at that time a member of the District Attorney's Office learned—you learned about this information to eliminate you the night you were to testify?

"A. Yes, sir.

"Q. And you—you were told the next day?

"A. That's right.

"Q. And didn't make you very happy; did it?

"A. Didn't make me very happy with anybody.

"Q. And I take it those sentiments you carry with you today as well? Yes?

"A. Yes.

"[PROSECUTOR]: Nothing further.

"THE WITNESS: That and the fact I'm still being threatened."

Thereafter, on recross-examination, by posing questions to Guillory, defense counsel probed the details of what Guillory had heard about the plot to kill him, asking whether Donna Guthrie, or her daughter Cindy, or another person was supposed to have performed the "contract" to "kill" him. In this regard, defense counsel read from a report authored by Inspector Sjostrand, to

the effect that "part of the set up to kill him [Guillory] was to have Cindy, Donna's daughter, tell him she had missed her bus in Richmond and needed a ride to Sacramento. She was to ask him to take her to Sacramento and he was supposed to go end up dead floating in the river somewhere along the way." Defense counsel asked Guillory whether he had provided this information to Sjostrand, to which Guillory responded: "Not in so many words."

### 2. *Claims of misconduct and trial court error*

Defendant asserts the prosecution committed misconduct by "manufacturing" evidence—namely, telling Guillory that he had been the subject of a contract to kill, and then having Guillory parrot back that same assertion from the witness stand. As the People observe, defendant did not raise this claim of prosecutorial misconduct below (and accordingly the prosecution had no incentive to make a record on this point), and hence the claim has not properly been preserved for appeal. (*Green, supra*, 27 Cal.3d 1, 34.) But in any event, we find no indication in the record that the prosecution manufactured this evidence. Based upon the combination of the testimony of Jacqueline Coghlan (concerning the transfer of $1,000 from defendant to Solvang), the testimony of Inspector Sjostrand (concerning the intercepted December 5, 1989, telephone call from "Richard" to Solvang), and defendant's reference in his letter to Donna Guthrie to "the cookie" and "how one little mess can be cleaned," the existence of a contract to kill Guillory was a potential inference that reasonably could be drawn from the evidence. And, based upon Guillory's description of what he had been told by Pat, it appears that Guillory could well have reached, on his own, the conclusion that there was a plot to kill him. We conclude that the record does not establish that the prosecution "manufactured" evidence of a contract or plan to kill Guillory.

Defendant also asserts that the prosecution, by asking Guillory questions that led to the testimony concerning the statements by Pat relating to the alleged plan to leave Guillory floating in the Sacramento River, committed misconduct by assuming a critical fact not in evidence—namely, the existence of a plan or contract to kill Guillory. Again, defendant did not raise this claim of prosecutorial misconduct below, and hence the claim has not properly been preserved for appeal. (*Green, supra*, 27 Cal.3d 1, 34.) Moreover, as noted above, the initial reference before the jury to a plan to terminate Guillory's life was made by Guillory in response to a question not from the prosecution, but from defense counsel on cross-examination—and, at that point, defense counsel voiced no objection to Guillory's statement and did not move to strike the response. In addition, as noted above, given the testimony of Jacqueline Coghlan and Inspector Sjostrand, the existence of a contract to kill Guillory was at least a logical inference that reasonably could be drawn from the evidence. This inference also was consistent with what

Guillory testified he had heard elsewhere (apparently prior to the preliminary examination on December 6, 1989) from Pat. On this record, we cannot conclude that the prosecution committed misconduct in its follow-up questions by assuming facts not in evidence.

Defendant further argues that the prosecution should not have elicited, and the trial court should not have admitted, Guillory's testimony about what Pat earlier had told him, namely that Guillory was supposed to "get hit" and should not travel to Sacramento because he was being "set up" and might end up "floating" in the river. Although defendant asserts this testimony was inadmissible hearsay, as noted above the trial court admitted the testimony under an exception to the hearsay rule, as relevant to establish the "state of mind" of the witness, Terry Guillory.

As suggested above, Guillory was (at least initially) a reluctant witness. Moreover, throughout his entire testimony Guillory was shown frequently to be angry, rude, and coarse. On cross-examination, defense counsel attempted to show that Guillory was manipulative and untrustworthy. Accordingly, on redirect examination, the prosecution attempted to demonstrate that Guillory's demeanor was based in part upon his belief that he had been the subject of a death contract instigated by defendant (and that he still feared retaliation by defendant)[28] and also was based in part on the circumstance that Guillory was angry at the prosecution for failing to inform him earlier of the potential threat to his safety. In other words, the People attempted to show that Guillory was angry with both parties, and hence the jury should not view Guillory's demeanor as simply reflecting a bias against or animosity toward defendant.

---

[28] In this sense, the People assert, Guillory's state of mind was relevant—in part because, as has been observed, "[a] witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake in the testimony." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368 [37 Cal.Rptr.2d 596].) The court in *Olguin* went on to observe: "Just as the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility (*Calvert v. State Bar* (1991) 54 Cal.3d 765, 777 [1 Cal.Rptr.2d 684, 819 P.2d 424]), the fact a witness is testifying despite fear of recrimination is important to fully evaluating his or her credibility. For this purpose, it matters not the source of the threat. It could come from a friend of the defendant, or it could come from a stranger who merely approves of the defendant's conduct or disapproves of the victim. It could come from a person who perceives a social or political agenda to have been advanced by the defendant's actions. It could come from a member of the witness's profession, religion, or subculture, who disapproves of the witness's involvement for some reason. It could come from a zealot of any stripe, large groups of whom seem ready to rally to virtually any cause these days. [¶] Regardless of its source, the jury would be entitled to evaluate the witness's testimony *knowing* it was given under such circumstances. And they would be entitled to know not just that the witness was afraid, but also, within the limits of Evidence Code section 352, those facts which would enable them to evaluate the witness's fear." (*Id.*, at pp. 1368–1369.)

Defendant asserts this testimony should have been excluded under Evidence Code section 352 as more prejudicial than probative. But he made no such objection at trial, and hence that issue is waived. (Evid. Code, § 353, subd. (a).) In any event, on this record, for the reasons alluded to above, we conclude that the jury properly was made aware of what Guillory had been told by Pat.

Defendant insists that the trial court erred by failing to give the jury a contemporaneous (or indeed any) limiting instruction, which would have advised that references in Guillory's testimony and counsel's questions to a contract or plan to kill Guillory and to Pat's statements were to be used only to illuminate Guillory's state of mind and not to prove the truth of the matter asserted, that is, to prove that defendant actually had instigated a plan to kill Guillory in Sacramento.

When defense counsel first objected on redirect examination to Guillory's references to the contract or plan to kill him, counsel asked that the jury be admonished that "questions are not evidence" and complained, "it's a question of misleading the jury as to whether or not these facts are true or not." The trial court observed that it had given instructions on that subject prior to presentation of the evidence[29] (and indeed such instructions were given again after the close of the case)[30] and that if defendant wanted "a more focused instruction at a later point I'll entertain it." Trial counsel, however, never reasserted the issue of a "more focused instruction" and did not press then, or later during Guillory's testimony concerning Pat's statements to him, for a contemporaneous limiting instruction.

Defendant asserts that in light of the limited use for which Guillory's testimony concerning a plot to *kill* him (rather than merely prevent his testimony by other means) was admitted into evidence, and because the claimed plot to kill Guillory assertedly "became such a dominant part of the prosecution's evidence of guilt," the trial court erred by refusing to provide an immediate limiting instruction upon request and also bore a sua sponte duty to instruct the jury subsequently concerning the limited admissibility of that evidence. Viewing the record as a whole, we disagree with defendant's premise that the claimed plot to kill Guillory became a dominant part of the

---

[29] Prior to the opening statements of the parties and the introduction of evidence, the trial court instructed the jurors that statements of the attorneys are not evidence and that a question, in and of itself, is not evidence and should be considered only to the extent it supplies meaning to the answer given.

[30] During closing instructions the jury was informed (pursuant to CALJIC No. 1.02) that statements of the attorneys are not evidence, and that the jurors should not assume to be true any insinuations suggested by a question asked of a witness, that a question is not evidence, and that a question may be considered only as it enables jurors to understand the answer.

prosecution's evidence of guilt. The challenged aspect of Guillory's testimony was only briefly and obliquely referred to during the prosecutor's closing argument to the jury, and was not mentioned at all in the prosecution's rebuttal argument.[31] Under these circumstances, we believe it is clear the trial court did not err by failing on its own motion to give the additional limiting instructions to which defendant now asserts he was entitled.

In any event, if we were to assume that the trial court erred in this regard, any such error would have been harmless. The truly dominant aspect of the prosecution's evidence of guilt did not focus upon the brief references to an alleged plot to prevent Guillory's testimony and also kill him. Instead, as recounted *ante*, part II.C., the prosecution's case focused upon the strong evidence of defendant's guilt of the three killings with which he was charged. In view of all of this evidence, it is not reasonably probable that Guillory's various statements of his belief that he was the subject of a plot by defendant to kill him affected the result in this case. (*People v. Watson, supra*, 46 Cal.2d 818, 836.)

### 3. *Asserted ineffective assistance of defense counsel*

Defendant asserts trial counsel performed deficiently by (i) failing to object earlier than he did to references to a contract or plan to kill Guillory; (ii) failing to challenge the admissibility of Pat's statement to establish Guillory's state of mind; (iii) failing to object to the reference to Pat's statement to Guillory as being unduly prejudicial under Evidence Code section 352; (iv) eliciting, on recross-examination, additional details concerning the asserted

---

[31] At closing argument, the prosecutor commented: "Murray Lucas—I forgot about Murray Lucas—but [defendant] certainly didn't—Murray Lucas was a loose end. Murray Lucas was a witness. There was no animosity. There was no heart. There was no revenge with Murray Lucas. Murray Lucas was just there. He was the evidence of the crime that had just been committed, and he had to be eliminated. And that's exactly what happened to Murray Lucas; nothing more, nothing less. And exactly that. The most cold-blooded kind of killing that you could imagine is the killing of a witness to prevent them from saying what they saw. [¶] Kind of brings Terry Guillory to mind too; doesn't it?"

Although the prosecution made no further reference to any plot to kill Guillory, defense counsel referred to a "hit" and a "hit man" during closing argument: "You know, [the prosecutor] wasn't a witness to this case. I wasn't a witness to this case. . . . And he talks about a hit—a hit man. He calls Officer Sjostrand to establish the hit, and he read you the tape this morning. This is Officer Sjostrand on the stand. We didn't hear the tape; did we? It's reviewed over in police headquarters." Defense counsel then quoted from the tape-recorded conversation, and asked: "What's that? Is that evidence of a contract? That's pretty convincing evidence, you know, where the evidence of this contract came. Officer Sjostrand told Terry Guillory there was evidence of a contract, then they introduced this taped statement through Officer Sjostrand—not the taped statement but his testimony. [¶] Then Terry Guillory says: 'I was told by Officer Sjostrand there was a contract.' [¶] Therefore there's a contract[?]" Defense counsel proceeded to question whether any contract existed.

plan to kill Guillory; and (v) failing to object to instructions concerning "other crimes" evidence and to request additional limiting instructions concerning other crimes.

As to most if not all of these five areas, it is questionable whether defendant can establish deficient performance under an objective standard of professional reasonableness. (*Strickland, supra,* 466 U.S. 668, 687–691; *Ledesma, supra,* 43 Cal.3d 171, 216–217.) First, as noted above, when the appellate record does not preclude a satisfactory explanation for counsel's actions, we will not find that trial counsel acted deficiently. (See *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *Pope, supra,* 23 Cal.3d 412, 425–426.) But we need not dwell on the question whether defendant can establish deficient performance by his trial counsel, because in any event, for the reasons set out above, defendant has not established prejudice, that is, a reasonable probability of a more favorable outcome in the absence of the assertedly deficient performance. (*Strickland, supra,* 466 U.S. at pp. 691–696; *Ledesma, supra,* 43 Cal.3d at pp. 217–218.) On the record before us, any assumed failings by defense counsel in this regard would be insufficient to undermine confidence in the judgment of guilt or the special circumstance finding.

### K. *Sufficiency of evidence to prove premeditation and deliberation in the killing of Murray Lucas*

Defendant asserts that although the record supports findings of premeditation and deliberation with respect to the killings of defendant's mother and Ardell, it does not reflect sufficient evidence of premeditation and deliberation with respect to the killing of Murray Lucas, the boarder who resided with them.

The test on appeal is whether a rational juror could, on the evidence presented, find the essential elements of the crime—here including premeditation and deliberation—beyond a reasonable doubt. (*People v. Sanchez* (1995) 12 Cal.4th 1, 31–32 [47 Cal.Rptr.2d 843, 906 P.2d 1129], and cases cited.) We conclude that evidence of (i) the manner of killing and (ii) the planning activity both support the jury's finding of premeditation and deliberation in the killing of Murray Lucas. (See *id.,* at pp. 32–33; *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942].) The killing was accomplished by a single execution-style shot fired from close range into the victim's forehead, in circumstances showing no evidence of a struggle. This plainly supports a finding of premeditation and deliberation. Moreover, it is clear that defendant carefully planned the killing of his parents, and that avoidance of detection was a major aspect of his planning. The evidence shows that after test-firing his .22-caliber gun, defendant proceeded to his mother's home late at night and employed that same weapon

at a time when the firing of shots might be disguised by the ambient sound of firecrackers set off during early Fourth of July celebrations. Defendant attempted to conceal the cause of death of his victims by carefully disposing of the ejected cartridges and attempting to set fire to the house. In this setting, the jury reasonably could have concluded that defendant's killing of the boarder, Murray Lucas, was part of defendant's overall plan to avoid detection. ■■■ That defendant may have formulated this particular aspect of his plan (the killing of Murray) at the scene, and perhaps quickly, does not preclude a finding of premeditation. As we observed in *Sanchez, supra,* 12 Cal.4th 1, 34, " ' "The true test is not the duration of time as much as it is the extent of reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' " Accordingly, we reject defendant's claim of insufficiency of evidence.

### L. Challenges to the admission of other testimony given by Terry Guillory and Gary Beach

Defendant asserts that the admission of various portions of the testimony of Terry Guillory and Gary Beach, elicited by the prosecutor on redirect examination, was improper and violated his right to confrontation under the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution.

Defendant focuses upon Guillory's testimony that he spoke with Donna Guthrie on the morning after the killings and asked whether she wished him to send the police to remove defendant from her house. Guillory recounted that Donna replied that "she'd get him out of the house herself" and "[a]way from her mom." Defendant asserts that this testimony improperly implied that Donna was afraid for her safety during the time she was with defendant shortly after the killings, and believed him guilty. In addition, defendant repeats the substance of the claim discussed above concerning Guillory's testimony about information he obtained from Pat.

For the reasons set out *ante,* part II.J.3., we determine that the admission of Pat's statements to Guillory was not error, and even if it had been error, would not have been prejudicial. We reach the same determinations concerning Guillory's brief testimony from which defendant asserts the jury might have inferred that Donna was afraid of defendant following the killings and believed him guilty. The People assert that defense counsel opened the door to such questioning through cross-examination, during which Guillory testified he wanted to "warn Donna, so she could get the maniac away from her mom." Relying upon *Dutton v. Evans* (1970) 400 U.S. 74, 88 [27 L.Ed.2d 213, 91 S.Ct. 210] (opn. of Stewart, J.), the People assert that no error occurs when a witness's testimony is used merely to prove that a statement was

made.[32] Although it is questionable whether the admission of the challenged statements was error, we conclude that in any event such error would have been harmless beyond a reasonable doubt in light of the strong and wholly independent evidence demonstrating that defendant was in fact guilty of the crimes charged.

We reach the same conclusions with respect to defendant's claims concerning the testimony of defendant's cousin, Gary Beach. Upon examination, Beach stated that (i) he was told by Rory Pillow that defendant claimed that when he test-fired his gun in the backyard of the Harbour Way house, he was using blanks; and that (ii) defendant had made numerous attempts to complete collect telephone calls to Beach's home prior to the preliminary hearing. Defendant claims that in both respects the testimony was inadmissible hearsay, and that in the latter respect the testimony improperly implied that members of defendant's own family had refused his collect telephone calls because they believed him guilty of the charged crimes.

As the People observe, Gary Beach's statement that Rory Pillow had told him that defendant had stated he had fired blanks was not offered for its truth—and indeed was contrary to the prosecution's theory that defendant had test-fired a *live* round into the garage door at the Harbour Way home. The statement appears to have been introduced to show defendant's consciousness of guilt. In any event, even assuming an evidentiary violation, any error was harmless. This minor evidence of defendant's consciousness of guilt certainly would have been overshadowed in any reasonable juror's mind by the additional ample evidence of defendant's consciousness of guilt—especially his plot to keep Terry Guillory from testifying, and the properly admitted testimony of Gary Beach, recounting defendant's attempt to persuade Beach to testify falsely that defendant had test-fired a .25- or .32-caliber gun rather than the .22-caliber weapon actually used. That, and the other properly admitted evidence demonstrating defendant's guilt, rendered admission of the challenged testimony, assuming it was erroneous, harmless beyond a reasonable doubt.

As defendant notes, Beach also testified that defendant, while awaiting the preliminary hearing in this case, attempted to make "dozens" of collect phone calls to him from the jail, and that all but one of these attempted calls were refused by Beach or other members of his household. Even assuming that defendant's hearsay objection to at least some of this testimony should have

---

[32] The plurality opinion in *Dutton v. Evans* observed that "[t]he hearsay rule does not prevent a witness from testifying to what he has heard . . . . From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard." (*Dutton v. Evans, supra,* 400 U.S. 74, 88.)

been sustained, in light of the record in this case any error was harmless beyond a reasonable doubt. As the People correctly observe, far more probative and damaging was the properly admitted evidence that on the one occasion when Beach did accept defendant's collect telephone call, defendant attempted to persuade Beach to perjure himself by testifying that the gun that defendant had test-fired was a .25- or .32-caliber weapon, and not a .22-caliber weapon (the type of firearm used in the killings). This evidence, together with the other properly admitted evidence admitted at trial (showing defendant's motive, presence at the crime scene, and consciousness of guilt), strongly demonstrated defendant's guilt of the charged offenses.

## M. *Asserted prosecutorial misconduct at the guilt phase of the trial*

Defendant asserts that in 11 respects—some of which have been alluded to earlier—the prosecutor committed reversible misconduct at the guilt phase of the trial. As explained below, most of these subclaims have been forfeited by trial counsel's failure to object below; in any event, we find little if any evidence of misconduct, and no reversible misconduct.

### 1. *Expression of personal belief in defendant's guilt*

Defendant observes that at one point during closing argument, the prosecutor commented: "That's the only reason we brought [these charges], is because they're true." Defendant asserts that this "declaration of personal opinion" amounted to "flagrant" misconduct and a violation of professional norms. (See, e.g., *United States v. Young* (1984) 470 U.S. 1, 7–8 [84 L.Ed.2d 1, 105 S.Ct. 1038]; *People v. Kirkes* (1952) 39 Cal.2d 719, 726–727 [249 P.2d 1].)

As the People observe, because the statement was not objected to below, and because a timely admonition would have cured any harm, this claim may not be asserted on appeal. (*Green, supra,* 27 Cal.3d 1, 34.) Moreover, we perceive no misconduct. What defendant fails to acknowledge, in this instance and many others discussed below, is the context in which the challenged phrase was uttered. The prosecutor's argument proceeded as follows: "There's absolutely a lot of detail in this case. There's quite a bit of evidence. I tried to, fairly and accurately, represent to you what I think the evidence in this case has shown. But what I fully expect, as I indicated at the outset, to put the People to your test. You test these charges. We need you to do that. We have no expectation that you're going to return a verdict of 'guilty,' unless you're convinced beyond a reasonable doubt and to a moral certainty that [defendant], in fact, on [the Fourth of July], 1989—that he killed these three people. *That's the only reason we brought them, is because they're true.*

And the evidence has demonstrated that beyond any reasonable doubt. [¶] *But I have never asked you to take my word for it.* You take a look at the evidence in this case, ladies and gentlemen. And there is but one reasonable interpretation. We didn't hear another reasonable interpretation. It was conspicuous in its absence; wasn't it? But the fact it wasn't mentioned, doesn't mean our burden is over. You put the People to test. You do that after deliberating with the other eleven members of the panel. And once you do that, there is but one reasonable interpretation of all of this evidence: [Defendant] is guilty as charged." (Italics added.)

In context, it is clear that the prosecutor's message was that the jury should examine the evidence and conclude *for itself* whether defendant was or was not guilty—and the prosecutor urged that the evidence was reasonably susceptible of only a determination of guilt. We discern no misconduct. But even assuming misconduct, there would have been no prejudice. The trial court repeatedly instructed the jury that the arguments of counsel were not evidence and that the jury was required to decide the case based upon the evidence adduced at trial. In light of the evidence and the instructions under which the jury was directed to deliberate, the prosecutor's brief remark, accompanied as it was by proper comments concerning the evidence and the jury's role as fact finder, resulted in no "miscarriage of justice within the meaning of the Constitution." (*Green, supra*, 27 Cal.3d 1, 34.)

> 2. *Asserted repeated vouching for the credibility of prosecution witnesses*

Defendant highlights seven transcript passages in which, he asserts, the prosecutor vouched for the credibility of his witnesses. As we held in *People v. Frye* (1998) 18 Cal.4th 894 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*), "[a] prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor permitted to place the prestige of [his or] her office behind a witness by offering the impression that [he or] she has taken steps to assure a witness's truthfulness at trial. [Citation.] *However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [the prosecutor's] comments cannot be characterized as improper vouching.*" (*Id.*, at p. 971, italics added.)

Defendant cites as misconduct (improper vouching) the following italicized passages of the prosecutor's comments to the jury:

First, during opening statements, the prosecutor commented: "You may hear vernacular, you may hear profanity—we're going to tell you the way it is, we're not going to sugarcoat things—the witnesses from whom you're going to hear do not look like you folks look—you all, every single one of you, are cleanly, nicely dressed, with varying degrees of attire from casual to formal. The witnesses in this case are not going to be like that, but *they're going to tell you what happened, and they're going to tell you truthfully*. And there may be some 'motherfuckers' and 'bullshits' mixed in there someplace, but that's what this case—that's part of what this case is. And so, understand that that's part of the truth of this—these lives—and that's what we're going to try to bring to you during the course of this trial." (Italics added.)

Second, concerning the testimony of Shane Powell, Mary Perron, and Terry Guillory, the prosecutor commented during closing argument at the guilt phase of the trial: "So you can see when you're talking honesty, you have to go deeper than appearance. Because I tell you right now—and I submit to you—true honesty doesn't come from the mind, it comes from the heart. And you heard from some people who may not be the most educated of people, but when it came to the things that they told you about, the things they related to police officers within 12 hours of the time they happened, *they were just trying to tell it the way they knew*. They had no axe to grind; they had no motive; they had no bias against one person or the other. [¶] They had these perceptions that became relevant when three bodies were found, and they made those perceptions known to the police very soon after these events occurred. And that's the very probity of the reliability of those statements they made." (Italics added.)

Third, in discussing Terry Guillory's testimony during closing argument at the guilt phase of the trial, the prosecutor commented: "You have to get over Terry Guillory calling defense counsel a 'prick' and talking about having to 'pee' just before he concluded his testimony, and that's a little uncomfortable to listen to; isn't it? And you may have a few bad things to think about Terry Guillory because he's got a demeanor in the Superior Court that we would think would be unbecoming a witness. I've got some news for you; in point of fact, maybe for one reason—because what he was doing. *Terry Guillory was probably the most honest witness you heard. He told it like it was.* He hasn't the social mores that most of us would have. He was saying the things that a lot of other witnesses, like Mary Perron and Shane Powell, were saying—thinking—when they went under examination. So you have to go through those hurdles. But remember—consider the content." (Italics added.)

Fourth, again discussing the testimony of Shane Powell, Mary Perron, and Terry Guillory, the prosecutor commented: "The witnesses from whom you heard—the citizen witnesses—may not have been pretty, but *there was a lot*

*of truth there. There was a lot of honesty there.* There was a lot of people who were just doing what they had to do because the circumstances demanded it of them. And I would hope—and I would think—that when you analyze and you go through all of this evidence, that truth will become starkly clear in your mind, because that's what this case is all about. It is the clarity of the minds of the people who made the observations when they did, and who related those observations within 12 hours of the time that they made them, when they had absolutely no motive to do anything other than tell the truth, when their observations were as clear in their mind as they possibly could be, and when they related, time and time and time again, under the rigors of a heated cross-examination, as well as direct examination, the same thing—essentially, it was the same thing. Their stories didn't change, because they were remembering something that happened." (Italics added.)

Fifth, again discussing the testimony of Terry Guillory, the prosecutor focused the jury's recollection upon the evidence in the case—the demeanor and expressions of Guillory when he testified: "[I]t's that demeanor thing that's very difficult to focus in on. But I don't know if you remember the look of Rory Pillow when he was listening to the question he was asked. I submit his thoughts were not dissimilar from the expressions made by Terry Guillory. He just had a little more maturity and was able to reserve himself. Remember that when you think about the testimony of Terry Guillory that the—*what he said was not dishonest.* It was unpleasant." (Italics added.)

Sixth, after explaining the manner in which Shane Powell's testimony—including the circumstance that he heard five gunshots, and heard the scream, "No, Richard, no"—was consistent with both the physical evidence and with Mary Perron's testimony, and with Powell's earlier statements to the police on the Fourth of July and at the preliminary hearing, the prosecutor commented: "*Shane Powell is a credible witness. Shane Powell is credible on the [Fourth] of July, Shane Powell was credible at the time of the preliminary hearing, Shane Powell was credible here.*" (Italics added.)

Finally, once again discussing the testimony of Shane Powell, the prosecutor commented: "And the most compelling statement of all, you heard me say it a couple times, I can't, I'm sure, even come close to approximating the shrill and the voice, the fear and despair. I don't know. I—I think there's no way really to know other than to have experienced that which is, one, another reason by the way *you ought to know what Shane Powell tells you is true.* I would venture to say [']no Richard no['] is forever engrained in the recesses of Shane Powell's mind and he'll never be able to forget it. He'll be able to testify ten years from now as he did here in this trial in the middle of the [week]. That's how momentous it was." (Italics added.)

Defendant failed to object at trial to any of these comments. Because timely admonitions would have cured any harm, the claims of misconduct may not now be asserted on appeal. (*Green, supra,* 27 Cal.3d 1, 34.) Moreover, we perceive no misconduct. As a general matter, the challenged statements by the prosecutor, when viewed in the context of the prosecutor's preceding and subsequent remarks, constitute permissible comment on the state of the evidence—in other words, conclusions that the prosecutor was drawing from the evidence and from reasonable inferences based on the evidence. Defendant has failed to "show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*Frye, supra,* 18 Cal.4th at p. 970.) In any event, there was no prejudice. As noted previously, the trial court repeatedly instructed the jury that the arguments of counsel were not evidence and that the jury was required to decide the case based upon the evidence adduced at trial. In light of the evidence and the instructions to the jury, the prosecutor's brief remarks could not have resulted in a "miscarriage of justice within the meaning of the Constitution." (*Green, supra,* 27 Cal.3d 1, 34.)

### 3. *Asserted "constant disparagement" of defense counsel and defendant*

Defendant asserts that on numerous occasions throughout the trial the prosecutor—by his language, facial expressions, tone of voice, and accusatory speaking objections—disparaged the character and integrity of defendant and defense counsel in front of the jury. For example, defendant cites (i) defense counsel's closing argument to the jury, in which counsel told the jury that the prosecutor had glared and pointed at his client during trial; (ii) the prosecutor's comment, "Don't direct your questions to me, Counselor," in response to defense counsel's question during the cross-examination of Shane Powell; (iii) the prosecutor's assertion that defense counsel's questions of Powell were "obviously calculated to prejudice this jury"; (iv) the prosecutor's assertedly sarcastic tone, as exemplified in his statement made in response to a court order to show defense counsel all items to be handled by any witness: "Here. Let me comply with defense counsel's request"; and (v) the prosecutor's assertions, during closing argument, that the defense tactic would be one of "character assassination."

Many of defendant's cited examples, by his own admission, "appear innocuous if viewed in isolation." Indeed, we find most of the cited passages to be innocuous, even viewed in combination, when considered in the context of the surrounding testimony and circumstances. In any event, defendant failed to object at trial to any of these challenged comments. Because timely admonitions would have cured any harm, claims based upon these comments

may not now be asserted on appeal. (*Green, supra,* 27 Cal.3d 1, 34.) Defense counsel, however, did object at trial to two additional matters, which he now asserts as error.

During an in limine hearing prior to the introduction of any evidence, defense counsel complained to the court that the prosecutor had been glaring at defendant "hatefully, with a lot of tension," and asked the trial court to order the prosecutor to cease such conduct. The prosecutor acknowledged looking at defendant but denied any improper conduct. The trial court concluded that it could not rule on the request because it had not noticed any such conduct. We conclude that even if the prosecutor did on occasion glare at defendant in the manner complained of, the record does not establish or support a pattern of conduct so egregious as to infect the trial with anything approaching the level of fundamental unfairness that would constitute a denial of due process under the federal Constitution. (See *People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204] (*Espinoza*); *Donnelly v. DeChristophoro* (1974) 416 U.S. 637, 642–643 [40 L.Ed.2d 431, 94 S.Ct. 1868] (*DeChristophoro*).)

Defense counsel also voiced exception after the prosecutor at one point made a speaking objection in which he asserted that a question posed by defense counsel to Terry Guillory—asking whether Guillory recalled telling the prosecutor of "talk on the street" that Maurice Solvang and Donna Guthrie "were involved in this"—was "the most outrageous question I have ever heard" and that "[defense counsel] is in contempt of court because of that question." As defendant observes, the trial court eventually overruled the prosecutor's objection. But again, even assuming that in this and other instances the prosecutor at times was intemperate, the record does not establish a pattern of conduct so egregious as to reflect the level of fundamental unfairness that would constitute a denial of due process under the federal Constitution.

Although it is apparent from the record that the relations between defense counsel and the prosecutor at trial often were acrimonious, we find apt our observation in *Espinoza, supra,* 3 Cal.4th 806: "None of the instances that defendant characterizes as prosecutorial misconduct appears to have been either intended or likely to deceive the jury on any material issue. Moreover, it is not reasonably likely that the jury would have understood the prosecutor's bickering with defense counsel, or his use of facial expressions or gestures to express dismay or disbelief, to be a personal attack on defense counsel's integrity. In all likelihood, the jury viewed such behavior as expressing merely a clash of personalities. Thus, it is not reasonably probable that the prosecutor's occasional intemperate behavior affected the jury's evaluation of the evidence or the rendering of its verdict." (*Id.,* at pp. 820–821.)

### 4. *Deliberate and repeated refusal to comply promptly with court orders, making frequent and dubious objections, and contesting objections before the jury*

Defendant asserts that the prosecutor engaged in "chronic foot-dragging" with respect to discovery and other court-ordered matters, was guilty of irritating, annoying, and disrespectful conduct, and contentiously argued objections before the jury. For example, defendant asserts that (i) on the eve of trial the prosecutor furnished defense counsel with more than 400 pages of previously undisclosed telephone records; (ii) failed to disclose addresses of prospective witnesses in a timely manner; (iii) repeatedly failed to disclose until each evening recess the identity of the next day's witnesses; (iv) asked, and then withdrew, a "completely improper" question concerning threats made by "[defendant's] friends" against Guillory while in jail; (v) frequently failed to show defense counsel writings or exhibits before handing them to witnesses; and (vi) frequently interrupted defense counsel's examination with "frivolous or marginally meritorious" objections, and then argued with defense counsel rather than awaiting a ruling by the court.

Once again, because defendant failed to object at trial to any of these challenged comments or asserted actions, and because timely admonitions would have cured any harm, claims based upon these comments and alleged conduct may not now be asserted on appeal. (*Green, supra,* 27 Cal.3d 1, 34.) Furthermore, on the merits, we find the cited passages, when viewed in the context of the surrounding testimony and circumstances, to be innocuous.

Defense counsel did object at trial, on grounds of prosecutorial misconduct, to two other matters of which he now complains—(i) the claim that the prosecutor, at the preliminary hearing, wrongfully withheld evidence of defendant's plot to keep Terry Guillory from testifying, and (ii) the claim that the prosecutor committed misconduct by stating during cross-examination of Guillory that defense counsel's question concerning "street talk" was "the most outrageous question I've ever heard" and was contemptuous. But with regard to both circumstances, we previously have determined that no prejudice requiring reversal resulted (see *ante,* pts. II.D. & II.M.3.), and we reach the same conclusion in this context.

The trial court observed that at various stages of the trial, both counsel failed to exhibit "professional courtesies." The record, however, does not support defendant's suggestion that the resulting trial was fundamentally unfair or amounted to a denial of due process of law under the federal Constitution. (*Espinoza, supra,* 3 Cal.4th 806, 820; *DeChristophoro, supra,* 416 U.S. 637, 642–643.)

### 5. Claimed Griffin error

Defendant asserts that during closing argument the prosecutor improperly commented upon defendant's failure to testify, in violation of *Griffin v. California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*).

In the course of arguing to the jury concerning the meaning of "reasonable doubt," the prosecutor explained that the jury would be instructed that if circumstantial evidence is susceptible of two interpretations, one of which appears reasonable and the other unreasonable, the jury must reject the unreasonable interpretation and accept the reasonable. (See CALJIC No. 2.01.) Thereafter, the prosecutor argued as follows: "I challenge defense counsel to talk about the evidence in this case, and to tell you—give you—let us all listen very carefully to see if he does it—a reasonable interpretation of this evidence that says that Richard Bert Stewart is not guilty. . . . [¶] Now, if he doesn't do that, are you done? No. He doesn't have to say anything at all. Even if he doesn't offer you a reasonable interpretation of this evidence, you have an independent obligation to put the People to our proof as you find it."

Later, in closing, the prosecutor commented: "And there is but one reasonable interpretation. We didn't hear another reasonable interpretation. It was conspicuous in its absence wasn't it? But the fact that it wasn't mentioned, doesn't mean our burden is over. You put the People to the test. . . ."

Although defendant now asserts that these statements constituted comment upon his failure to testify, in violation of *Griffin, supra,* 380 U.S. 609, 615, he failed to object at trial to any of them. Defendant claims that the trial court "took virtually no action to reign [in the prosecutor]" and hence any objection would have been futile. The record discloses, however, that the trial court in fact did take numerous steps to control the frequent bickering between counsel and that defense counsel continued to make objections during the course of the trial, through the closing arguments—and hence dispels the notion that defense counsel considered objections to be futile. We conclude that because defendant failed to make a timely objection in this instance, he has no right to complain on appeal of the challenged statements. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1050–1051 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

In any event, we find the prosecutor's comments unobjectionable under *Griffin, supra,* 380 U.S. 609. Although " '*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand,' " the prohibition " 'does not extend to comments on the

state of the evidence. . . .' " (*People v. Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776].) In the first passage quoted above, the prosecutor merely anticipated the failure of defense counsel—not defendant—to provide to the jury a reasonable explanation consistent with defendant's innocence. In the second passage quoted, the prosecutor commented on defense counsel's argument as having failed to suggest to the jury such an interpretation of the evidence. This was permissible argument based on the state of the evidence, and we conclude there was no reasonable likelihood the jury would have construed or applied the prosecutor's remarks as focusing upon defendant's silence or failure to take the witness stand.

### 6. *Asking assertedly improper questions*

Defendant claims that in three respects, the prosecutor committed misconduct by asking improper questions.

When the prosecutor asked Terry Guillory whether any member of the district attorney's office, or of any law enforcement agency, had threatened him in order to make him testify, Guillory responded, "No, not by the District Attorney's Office or any police agency." The prosecutor then asked "was—were there threats made to you by somebody?"—to which Guillory responded, "Yes, they were." The prosecutor asked who had made those threats, and Guillory responded: "[Defendant's] friends. They've been threatening me in jail for the last three days. I got a note underneath my door." At that point, defense counsel objected that he had not received any information concerning such threats, and in response the prosecutor stated that he would "withdraw the question"—to which defense counsel simply stated, "Thank you." Defendant now asserts that "withdrawal was ineffective to cure the harm."

Second, defendant claims that the prosecutor committed misconduct by asking Detective Kimura why he attended Gloria Pillow's funeral. In response, the detective gave a partial answer: "There was a possibility—and a concern by the family of Ms. Pillow—." Defense counsel interrupted before the witness could finish, and the prosecutor immediately said he would "reask the question: Did you see [defendant] at Gloria Pillow's funeral?" The detective responded that he did not.

Finally, defendant reasserts the essence of a subclaim addressed and rejected above (see *ante*, pt. II.L.), that the prosecutor improperly elicited testimony from Guillory concerning his telephone conversation, on the morning after the killings, with Donna Guthrie—testimony that implied Guthrie's fear of defendant following the killings.

Defense counsel did not object on misconduct grounds to the "threats" or "Pillow family concern" in the questions described above. Because a timely

admonition would have cured any resulting harm, defendant cannot now complain of this asserted misconduct on appeal. (*Green, supra*, 27 Cal.3d 1, 34.)

In any event, on the facts of this case, any misconduct that occurred would be harmless. We already have explained that, even assuming misconduct in the prosecutor's question that elicited Guillory's testimony implying that Donna Guthrie feared defendant after the killings, any such misconduct was nonprejudicial in light of the properly introduced evidence at trial. (See *ante*, pt. II.L.) We reach the same conclusion with respect to that same subclaim here, as well as with respect to the asserted misconduct concerning the prosecutor's follow-up question about threats made to Guillory while he was in jail and Detective Kimura's assertion that he attended the funeral because of "concern by the family of Ms. Pillow—." In light of the strong and independent evidence demonstrating that defendant was in fact guilty of the crimes charged, any assumed misconduct was nonprejudicial.

### 7. *Alleged misstatement of the burden of proof*

Defendant asserts that during closing argument the prosecutor misled the jury by confusing circumstantial evidence rules with the reasonable doubt requirement, thereby creating a substantial likelihood one or more jurors would place the burden on defendant to affirmatively raise a reasonable doubt in order to gain an acquittal.

The challenged comments of the prosecutor were as follows: "Now, we're starting to get a little better sense of what 'burden of proof beyond a reasonable doubt' means. It means: Is there a reasonable interpretation of this evidence other than Richard Bert Stewart killed three people? The answer to that question is no. And, ladies and gentlemen, I'll do it right now. I challenge defense counsel to talk about the evidence in this case, and tell you—give you—let us all listen very carefully to see if he does it—a reasonable interpretation of this evidence that says that [defendant] is not guilty. . . ."

Once again, defense counsel did not object to this passage, and because a timely admonition would have cured any resulting harm, defendant cannot now complain of this asserted misconduct on appeal. (*Green, supra*, 27 Cal.3d 1, 34.) In any event, on the facts of this case, any misconduct would be harmless. The statement was plainly an attempt to elaborate on the interaction between the concepts of reasonable and unreasonable doubt, and the burden of proof beyond a reasonable doubt. It is highly questionable whether a reasonable juror, hearing only the quoted language, would understand that the prosecutor was advising that *defendant* bore the burden of

establishing reasonable doubt. But as explained below, the jury did not hear only the quoted language—and indeed, in light of the rest of the prosecutor's comments, it is plain that no reasonable juror would have understood or believed that defendant bore the burden of establishing reasonable doubt.

The prosecutor did not previously or thereafter argue that defendant's failure to offer an adequate explanation of the killings itself warranted a guilty verdict. Pri or to the challenged comments, the prosecutor twice explicitly acknowledged that the People bore the burden of proving their case beyond a reasonable doubt. Indeed, as noted *ante*, part II.M.5., immediately after making the challenged comments, the prosecutor explicitly posed the question to the jury whether, if defense counsel failed to provide a reasonable interpretation of the evidence showing defendant to be not guilty, "are you done? No. He doesn't have to say anything at all. Even if he doesn't offer you a reasonable interpretation of this evidence, you have an independent obligation to put the People to our proof as you find it." The prosecutor continued: "Where is the reasonable interpretation of this evidence which points to anything other than the guilt of [defendant]? It doesn't exist. That is what the burden of proof beyond a reasonable doubt is all about. And that's why the instruction says the defendant is entitled to a reasonable doubt. He is not entitled to an unreasonable doubt." Subsequently, the prosecutor reiterated that even though defense counsel had not given the jury any reasonable explanation of defendant's role in the killings, that "doesn't mean our burden is over. You put the People to the test. . . ."

We conclude that when viewed in their entirety, the prosecutor's statements were not likely to mislead a reasonable juror into believing that defendant bore the burden of establishing a reasonable doubt, and did not constitute misconduct.

### 8. *Reiterated claims of asserted misconduct*

Defendant reiterates four claims of asserted misconduct that we have discussed and rejected earlier—(i) alleged misconduct in withholding material evidence until after commencement of the preliminary hearing (*ante*, pt. II.D.); (ii) alleged misconduct in causing Maurice Solvang to claim the Fifth Amendment privilege and in refusing to grant him immunity (*ante*, pt. II.E.2.); (iii) alleged misconduct in offering portions of defendant's letters from prison and jail as "bad character" evidence (see *ante*, pt. II.I.); and (iv) alleged misconduct in asking questions that assumed facts not in evidence, and in eliciting hearsay concerning an alleged contract to kill Terry Guillory (*ante*, pt. II.J.2.). We again reject these claims in this context.

### 9. Asserted ineffective assistance of defense counsel related to alleged misconduct

Finally, defendant asserts that to the extent trial counsel failed to object to the foregoing instances of alleged prosecutorial misconduct or to request curative admonitions, defense counsel's legal representation was constitutionally ineffective. We disagree. In each of the circumstances described above, reasonable counsel may well have determined that an objection would be unwise, either because the challenged conduct was not improper or because an objection (and possibly an admonition as well) likely would have served to highlight matter that might be unfavorable to defendant. Accordingly, the appellate record does not preclude a satisfactory explanation for counsel's action, and hence we shall not find that counsel acted deficiently. (See *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *Pope, supra,* 23 Cal.3d 412, 426.) Defendant has failed to establish deficient performance under an objective standard of professional reasonableness. (*Strickland, supra,* 466 U.S. 668, 687–691; *Ledesma, supra,* 43 Cal.3d 171, 216–217.) In any event, for the reasons previously recounted *ante,* part II.C., defendant also has failed to establish prejudice, that is, a reasonable probability of a more favorable outcome in the absence of the assertedly deficient performance. (*Strickland, supra,* 466 U.S. 668, 691–696; *Ledesma, supra,* 43 Cal.3d 171, 217–218.) On the record before us, it is not reasonably probable that, had trial counsel made the objections or sought the admonitions the absence of which defendant now characterizes as error, the jury's verdict of guilt or special circumstance finding would have been different. In other words, trial counsel's alleged failings in this regard are insufficient to undermine confidence in the outcome of the trial. (*Strickland, supra,* 466 U.S. at p. 694.)

### N. Denial of defendant's motion for a new guilt and special circumstance phase trial, based upon asserted juror misconduct

In support of a motion for new trial filed after the jury returned its penalty verdict, defendant submitted an affidavit sworn and signed by defendant's former girlfriend Jacqueline Coghlan, as follows: "My testimony as a witness was interrupted by a break for lunch. While in the restroom, Juror No. 2 made the following statement to me: [¶] 'We're not supposed to have any contact but I just wanted to tell you that you're a very beautiful woman.' [¶] I replied, 'I don't feel so beautiful right now.' "

The People filed a response to the motion in which the prosecution addressed the misconduct allegation and appended a declaration from the juror who had spoken to Jacqueline Coghlan. (As defendant acknowledges, the juror in question was actually Juror No. 5, who was a woman, not Juror

No. 2, who was a man.) In that declaration, Juror 5 first stated that she was a juror "in the number five position" in the case and then asserted: "2. During a break in the testimony of witness Jackie Coghlan, I saw Ms. Coghlan in the ladies restroom; [¶] 3. While in the restroom, I said to Ms. Coghlan something to the effect of [¶] 'I know we're not suppose[d] to have any contact but I just wanted to tell you're a very nice looking (or attractive) lady.' [¶] 4. I have no idea what she said after that because I walked out the door. I know she said something back but I didn't hear it because I went out the door. [¶] 5. This brief contact did not in any way affect my ability to be fair and impartial in this case."

The trial court concluded that assuming there was misconduct, it was "clearly of a trifling nature and [did] not warrant the granting of a new trial."

We agree with defendant that Juror No. 5 committed misconduct. (*People v. Jones* (1998) 17 Cal.4th 279, 310 [70 Cal.Rptr.2d 793, 949 P.2d 890]; Pen. Code, § 1122, subds. (a) & (b) [forbidding conversations between jurors and "anyone else, on any subject connected with the trial"].) In speaking to Coghlan, Juror No. 5 violated the trial court's repeated and explicit admonitions to avoid contact with all other persons—including witnesses—associated with the case.

As we observed in another capital case, however, when misconduct is " ' "of such a trifling nature that it could not in the nature of things have been prejudicial to the moving party and where it appears that the fairness of the trial has been in no way affected by such impropriety, the verdict will not be disturbed." ' " (*People v. Miranda* (1987) 44 Cal.3d 57, 118 [241 Cal.Rptr. 594, 744 P.2d 1127].) The "trifling" misconduct at issue in *Miranda*, which we found to be nonprejudicial, consisted of a juror approaching the defendant's girlfriend (who attended the trial as a spectator) and thereafter, while the trial continued, engaging in extensive conversations with her, displaying an obvious romantic interest. Manifestly, the facts set out in the declarations in this case demonstrate a lesser degree of misconduct than that at issue in *Miranda,* and do not appear to have involved anything of substance concerning the merits of the case.

The trial court did not err in denying a new trial on the basis of juror misconduct. As we have explained, "[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant. (E.g., [*People v.*] *Carpenter* [(1995)] 9 Cal.4th 634, 653 [38 Cal.Rptr.2d 665, 889 P.2d 985] . . . .)" (*In re Hamilton* (1999)

20 Cal.4th 273, 296 [84 Cal.Rptr.2d 403, 975 P.2d 600].) Disregarding, under Evidence Code section 1150, Juror No. 5's assertion that the event did not affect her ability to be fair and impartial in the case, the remaining aspects of the declarations, viewed together with the entire record in this case, do not establish any substantial likelihood that Juror No. 5 actually was biased against defendant. Nor was the interaction "inherently and substantially likely to have influenced the juror." (*People v. Carpenter*, *supra*, 9 Cal.4th at p. 653.)

### O. *Interference with defendant's right to counsel and to self-representation*

Defendant asserts that, after completion of the preliminary hearing, arraignment, and subsequent pretrial proceedings (during the entirety of which he was represented by the Contra Costa County Public Defender, Mr. Charles James), defendant *improperly was permitted* to waive his right to counsel (and hence improperly to represent himself). During the ensuing nine months of pretrial proceedings from May 1990 until February 1991, James served as advisory counsel. Defendant further asserts that his right to self-representation improperly was interfered with by the limitations that the court placed upon James's role as advisory counsel, and that this ultimately resulted in defendant's determination to abandon self-representation in February 1991 (at which time James was reappointed to represent defendant for the remaining pretrial proceedings and trial). Defendant appears to suggest that the alleged error in allowing him to waive counsel for nine months of the pretrial period per se requires reversal of the ensuing judgment that was rendered after trial. Defendant also asserts that the alleged violation of his right to self-representation (by the limitations placed upon James's role as advisory counsel) requires reversal of the judgment without a showing of prejudice. As explained below, we conclude that no error occurred in either respect, and accordingly reject the arguments for reversal predicated on those grounds.

### 1. *Procedural background*

After completion of the preliminary hearing and the arraignment in this case, defendant sought to discharge his appointed counsel, James, and to represent himself. At a May 1990 hearing held by Judge Richard Arnason, defendant was questioned at length and ultimately was permitted to represent himself. At defendant's request, James was appointed to act in a limited role as advisory counsel. Judge Arnason admonished defendant that should he find self-representation to be too difficult or unworkable, defendant should inform the court well before trial.

Defendant's case subsequently was assigned to Judge (now Justice) Patricia Sepulveda, who stated in a September 1990 hearing that she had read defendant's waiver of counsel taken by Judge Arnason. Judge Sepulveda then conducted a further inquiry of defendant. The court, aware of defendant's then-recent stabbing of a fellow jail inmate in the neck with a sharpened pencil, advised defendant that further violence might interfere with his ability to prepare for trial. Defendant responded that he understood. The judge reconfirmed that James's role would be a limited one, and defendant reaffirmed his desire to represent himself with James acting as advisory counsel.

Five months later, in February 1991, defendant appeared before Judge (subsequently Justice) Michael Phelan, before whom the case ultimately was tried. Defendant moved to reappoint James as his counsel, but stated he would want to return to self-representation if the case reached the penalty phase of trial. The court advised defendant that if James were reappointed, he would be counsel for "all purposes," and that if defendant wished to discharge appointed counsel and return to self-representation at a later time, the court would address that question then, by determining, among other things, whether defendant was then capable of representing himself. In response, defendant withdrew his motion to reappoint James. A week later, however, defendant renewed his request to reappoint James, but reiterated his intention to seek self-representation should a penalty phase be necessary. The court repeated that it could not make any commitment concerning defendant's right to self-representation at a penalty phase of the trial, but granted defendant's motion to reappoint James.

Defendant was represented by James at the guilt and special circumstance phase of the trial, and, upon conviction and the true finding of a special circumstance, moved to represent himself at the penalty phase of the trial. The next day—after being told by the court to reconsider that request overnight—defendant observed that he believed James had done "a fine job" of defending him and explained that his decision was "just more of a personal issue." The court explained that because the trial was ongoing, the decision whether to grant defendant's request was a matter for the court's discretion. (See *People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) In response to the court's inquiry concerning whether defendant planned to introduce evidence in mitigation at the penalty phase of the trial, defendant answered that he would make that decision later. Defendant explained that he had elected to accept James at the guilt phase of the trial for tactical reasons—for example, defendant said he would not have felt effective had he personally cross-examined Jacqueline Coghlan, among other witnesses. Defendant also noted that he had long expressed a desire to represent himself at the penalty phase of the trial, and argued: "So I don't feel this is untimely. I was found competent by two Superior Court judges. There has been no change since. I'm not suffering any mental problems or emotional

problems. . . ." Judge Phelan further inquired of defendant concerning, among other things, his right to counsel and to self-representation, and then granted defendant's motion, appointing James as advisory counsel. Defendant represented himself in all subsequent trial court proceedings, through sentencing.

### 2. *Asserted error in allowing defendant to waive counsel during nine months of pretrial proceedings*

Defendant asserts that Judges Arnason and Sepulveda erred by granting his request for self-representation in May and September of 1990, because he was incompetent to waive his right to counsel. Accordingly, defendant urges, he was denied his right to counsel during the pretrial period from May 1990 to February 1991. Indeed, defendant further suggests that the record shows there was, during this time, substantial evidence of his mental incompetence to stand trial or waive counsel, and that Judges Arnason and Sepulveda erred under section 1367 in failing, on their own motion, to order and conduct a competency hearing pursuant to section 1368.

As the United States Supreme Court clarified in *Godinez v. Moran* (1993) 509 U.S. 389 [125 L.Ed.2d 321, 113 S.Ct. 2680] (*Godinez*), in order to represent oneself at trial, (1) a defendant must *be competent to waive his or her right to counsel* (*id.*, at p. 399)—a determination that must be made, the court held, under the same test that applies to competence to stand trial, that is, the defendant must have a " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and . . . 'a rational as well as factual understanding of the proceedings against him' " (*id.*, at p. 396); and (2) the waiver of counsel must be *knowing and voluntary*—that is, the defendant must "actually . . . understand the significance and consequences" of the decision, and the decision must be "uncoerced" (*id.*, at p. 401, fn. 12; see generally *People v. Welch* (1999) 20 Cal.4th 701, 732 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1363–1364 [65 Cal.Rptr.2d 145, 939 P.2d 259].)[33]

We turn first to the lengthy examination conducted at the May 1990 hearing by Judge Arnason.

During that hearing defendant was advised of his right to counsel and was told that if he represented himself he would have no right to an attorney who would work for him or be under his control, and that his access to a law library would be less than that available to an attorney appointed to represent him. Defendant was advised that he would be expected to know and follow

---

[33] The high court explained: "In this sense, there is a 'heightened' standard for . . . waiving the right to counsel, but it is not a heightened standard of *competence*." (*Godinez, supra,* 509 U.S. at pp. 400–401.)

applicable evidentiary and legal rules and to behave in court as would an attorney. He was told that the prosecutor would be an experienced professional, that self-representation "is almost always unwise," and that by representing himself he might do "more harm than good" to his defense. Defendant replied that he understood, but still wished to represent himself. He explained that he had received a high school G.E.D., had an underwater diving certification, was 12 units short of an A.A. degree, had read "a thousand books" (including the Evidence Code and much of the Penal Code), had "[g]reat comprehension," and understood trials and the legal system. Finally, defendant stated that he understood the consequences—including being subject to the death penalty—should he be convicted. Defendant was informed, and acknowledged, that by representing himself he would be giving up "one of the most common bas[e]s for appeal," namely asserted ineffectiveness of trial counsel. Invoking his experience as a certified diver, defendant asserted that he could handle the pressure of a trial.

Judge Arnason concluded: "Well, [defendant] impresses me as being an individual who is certainly competent to make this decision under the *Faretta* doctrine [(*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525])]. He obviously has some background in dealing with situations where pressure could be applied. . . . [¶] Being a licensed deep sea diver is not the easiest thing in the world to acquire . . . . And your education is sufficient for me to find that you are able to understand the English language, to read, understand the documents fully. [¶] And I'm satisfied that this defendant therefore is entitled to from this time forward . . . be his own lawyer."

Defendant asserts that because, at the time he brought his motion before Judge Arnason, he had been accused of threatening potentially adverse witnesses and of arranging for a payment of $1,000 to keep Terry Guillory from testifying, Judge Arnason was required to find him incompetent to stand trial and hence incompetent to waive counsel. We disagree. The circumstance that defendant was accused of such misconduct did not provide a basis for questioning his competence either to stand trial or waive counsel, and defendant provides no authority to support his assertion.[34]

---

[34] We observe that during the colloquy with Judge Arnason, counsel were asked whether there was "any indication" of a "question as to [defendant's] mental condition or psychological condition." Defense counsel responded: "I make no comment, your Honor." At that point the court asked the lead prosecutor: "Has there been anything that would have been conveyed to you, . . . in your role as the attorney handling this case for the People, that this defendant has any psychological or psychiatric impediment which would affect his capacity to properly evaluate, understand, and participate in the proceedings?" The lead prosecutor responded: "With that limitation; no, your Honor."

We turn next to the follow-up inquiry conducted at the September 1990 hearing by Judge Sepulveda—to whom, at that time, defendant's case had been assigned for trial. Judge Sepulveda explained that from her reading of the transcript of the prior hearing, it appeared that defendant was legally entitled to represent himself. Judge Sepulveda asked defendant whether he was experiencing any problems, and whether he wanted to continue to represent himself. Defendant (who by that time had filed motions for pretrial discovery, change of venue, dismissal, and expanded telephone use, as well as a motion to declare the use of cyanide gas as a means of execution to be illegal) responded that he was having difficulty obtaining compliance with discovery requests and that his assigned investigator was overburdened with other cases. Defendant also mentioned that he had been authorized to incur $5,000 in expenses for a "venue study" to support his change of venue motion, and that he had been told that expenses for that study would amount to $10,000—but he added that he might submit the venue motion without the supporting documentation, because "I don't feel the venue study is going to tell me anything different than you all know, to be honest." On the whole, defendant asserted, he remained comfortable with the prospect of self-representation.

Judge Sepulveda then discussed with defendant various scheduling matters, such as when defendant planned to file future motions, and whether he could meet the then-target date for trial in November 1990. The court again admonished defendant that by representing himself, he would forgo his ability to assert, on appeal, ineffective assistance of trial counsel as a basis for relief, and that it would be difficult for defendant to prepare his own case from the jail, especially if he continued to have disciplinary problems in custody. In this regard, the court stated that it had become aware that defendant had been accused of stabbing a fellow inmate in the neck with a pencil.

Finally, Judge Sepulveda reiterated that James's role as advisory counsel would be a "limited" one. The court stated: "He can advise you. He can help you write your motions. He can talk to you. He'll be sitting there next to you if you want to have him there during the trial, during motions, but . . . *he would not be questioning the witnesses*, asking questions of potential jurors, arguing the motions. In other words, he won't be speaking for you. Now as I say, *he may convince me otherwise or you may convince me otherwise.* If you even want him to do something like that later on, but the reason for telling you that is as it might impact on your decision to stay in a pro. per. status. I don't want you to have a frame of mind where you think that you and Mr. James are co-counsel, and that you're going to be trying this case together. I just want you to understand that, okay?" (Italics added.) Defendant responded that he understood and still wished to represent himself, with James as advisory counsel.

Defendant asserts that despite this record, because Judge Sepulveda (i) knew he had stabbed a jail inmate with a pencil, and (ii) had been told by defendant that he might submit his venue motion without a supporting study, and because (iii) Maurice Solvang had asserted, in his unsworn December 5, 1989, interview, that defendant had acted strangely shortly before and after the killings, Judge Sepulveda should have harbored doubt concerning defendant's competence to stand trial and hence to waive his right to counsel. We disagree.

The stabbing incident surely suggested defendant's potential for violence (as of course did the charged killings themselves), but violent tendencies do not by themselves suggest incompetence to stand trial or waive counsel. The stabbing certainly did not suggest any absence of " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' " or " 'a rational as well as factual understanding of the proceedings against him.' " (*Godinez, supra,* 509 U.S. at p. 396.) Nor did defendant's stated plan (which he eventually undertook) to submit his venue motion without supporting documentation establish or suggest incompetence to stand trial or waive counsel. Defendant submitted numerous other motions, some successful, and ably argued them. That he submitted his venue motion without a supporting study may suggest, as defendant implied at the September 1990 hearing before Judge Sepulveda, that he did not believe the study was crucial to, or would add much to, the motion—but the circumstance that defendant held that view would not suggest incompetence to stand trial or waive counsel.

Moreover, the unsworn December 5, 1989, statement by Maurice Solvang, which defendant asserts should have alerted the court that defendant was incompetent to stand trial or waive counsel, was not before either Judge Arnason or Judge Sepulveda—and, indeed, was not introduced until after the trial had commenced. Accordingly, there is no reason for the information contained in the transcript of that interview to have informed the understanding of either Judge Arnason or Judge Sepulveda concerning defendant's competence to stand trial or waive counsel. Moreover, the assertedly relevant contents of the interview concerned defendant's demeanor on July 5, 1989— which was 10 months before the May 1990 hearing, and 14 months before the September 1990 hearing at which defendant asserts the court should have declared a doubt concerning his then-present ability to stand trial or waive counsel; hence this interview was of questionable relevance to defendant's *then-present* ability to stand trial or waive counsel. Finally, the description of defendant's mental condition set forth in the interview—disclosing Solvang's impression that defendant was "jumpy" after having taken drugs and appeared a few days before the killings "like a volcano that was building to the point of exploding," and that defendant was very irritated, agitated, scary, and distraught after the killings on July 5, 1989—does not suggest incompetence

to stand trial or waive counsel many months later. Thus, even if knowledge of the contents of Solvang's December 5, 1989, statement properly could be attributed to Judge Arnason or to Judge Sepulveda, these judges would not have had any substantial reason to doubt defendant's ability to stand trial or waive counsel.

We conclude that the record supports the conclusion of Judges Arnason and Sepulveda that defendant was competent to waive his right to counsel, and that his waiver was knowing and voluntary. Defendant's responses demonstrated, with regard to the question of competence to waive counsel, that he had " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and . . . 'a rational as well as factual understanding of the proceedings against him.' " (*Godinez, supra,* 509 U.S. at p. 396.) Defendant responded in an appropriate manner to questions posed to him, fully demonstrating his awareness of the circumstances he faced and the proceedings against him. He explained that he had consulted with his counsel, James, concerning his decision, and wished James—whom he considered "a very good attorney"—to remain available to him as advisory counsel. The record also clearly supports the determination that defendant's waiver was knowing and intelligent, in the sense he understood the significance and consequences of his decision, and that his decision was uncoerced. It follows that neither judge erred in accepting defendant's waiver of counsel.

### 3. *Asserted interference with right to self-representation*

Defendant asserts that assuming his waiver of counsel was proper and that he correctly was permitted to represent himself during nine months of pretrial proceedings, he thereafter was "coerced" by improper limitations placed upon the scope of his advisory counsel's authority, and as a consequence his right to self-representation was violated. Specifically, defendant argues that advisory counsel should have been given authority to question witnesses on defendant's behalf, and that the refusal of Judges Arnason and Sepulveda to permit such participation by James in turn "forced" defendant to forgo self-representation. Defendant also asserts that because capital defendants who are represented by counsel in complex cases may, in the trial court's discretion, be entitled to the appointment of second counsel (*Keenan v. Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108] (*Keenan*)), he was constitutionally entitled both to represent himself and to have counsel appointed to assist him as a second, fully participating counsel.

We held in *People v. Bloom* (1989) 48 Cal.3d 1194 [259 Cal.Rptr. 669, 774 P.2d 698] (*Bloom*): "[A] defendant who elects representation by counsel does not have a constitutionally protected right to appear as cocounsel [citations], and a defendant who elects self-representation 'does not have a constitutional

right to choreograph special appearances by counsel' (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 183 [79 L.Ed.2d 122, 104 S.Ct. 944]). Thus none of the 'hybrid' forms of representation, whether labeled 'cocounsel,' 'advisory counsel,' or 'standby counsel,' is in any sense constitutionally guaranteed. [¶] As the courts of other jurisdictions have expressly recognized [citations], the powers and responsibilities which attend the representation of a criminally accused person should never be conferred jointly and equally on the accused and the attorney. Rather, in all cases of shared or divided representation, either the accused or the attorney must be in charge. Stated otherwise, at all times the record should be clear that the accused is either self-represented or represented by counsel; the accused cannot be both at once. . . . [A] self-represented defendant who wishes to obtain the assistance of an attorney in an advisory or other limited capacity, but without surrendering effective control over presentation of the defense case, may do so only with the court's permission and upon a proper showing." (*Bloom, supra,* 48 Cal.3d at pp. 1218–1219.)

As is disclosed by the record set out above, defendant did not object to the challenged limitations at the time they were imposed, nor later when he claims to have been "coerced" into relinquishing his self-representation. Nor did defendant ever request or attempt to justify appointment of second counsel under—or by analogy to—*Keenan, supra,* 31 Cal.3d 424. Moreover, as the September 1990 transcript reveals, Judge Sepulveda expressly advised defendant that the court might reconsider the challenged limitations—including the bar against advisory counsel's participation in witness examination—upon request by defendant or counsel ("Now as I say, he may convince me otherwise or you may convince me otherwise. If you even want him to do something like that later on . . ."). Defendant did not resubmit the request at a later time or present a showing of a need for expanded participation by advisory counsel.

In the absence of an objection or request at trial, defendant may not raise the present claims on appeal. In any event, on the present record, the lower courts did not err in restricting the role of advisory counsel by precluding examination or cross-examination by advisory counsel.

### P. *Defendant's asserted incompetence to admit the two prior prison term enhancements*

After the verdict of guilt was returned (and one day before the trial court granted defendant's request to return to self-representation for the penalty phase of the trial), defendant waived his right to trial on the two prior prison term enhancements charged under section 667.5, subdivision (b) (establishing a one-year enhancement for "each prior separate prison term served for any

felony" unless the defendant for five years had remained free from custody and from any new felony conviction). Defendant now asserts that the trial court erred in accepting his waiver and at that time should have entertained, and declared, a good faith doubt concerning defendant's continued competence to stand trial and to waive trial on the prior prison term enhancements.

In support, appellate counsel asserts that defendant had been acting "erratically" during the pretrial period by improperly attempting to suppress evidence that might be offered against him and by stabbing a fellow jail inmate in the neck with a sharpened pencil, and that defendant continued to engage in inappropriate conduct at trial by twice "audibly commenting" during the prosecutor's closing arguments, "And you hid Maurice Solvang" and "What about Maurice Solvang." Appellate counsel asserts that thereafter, in response to the trial court's advisements concerning defendant's waiver of rights relating to the charged enhancements, defendant was "nonresponsive and argumentative."

The record does not reveal any substantial evidence of incompetence to stand trial or waive any of defendant's rights concerning the charged enhancements. The circumstance that defendant attempted to suppress evidence against him prior to trial suggests that defendant understood fully the charges against him and the possible consequences he faced; it does not suggest mental incompetence in any relevant respect. The stabbing incident, which had occurred approximately eight months prior to the waivers at issue, did not suggest any present incompetence to waive trial or the corresponding rights related to determination of the prior prison term allegations. The two minor interjections made by defendant during the prosecutor's closing argument, although inappropriate as a matter of courtroom decorum, actually were quite logical when viewed in context—for example, regarding the second comment, defendant was reacting to the prosecutor's argument that the failure to present the testimony of a particular witness did not "mean[] that the People have something to hide." The response, "What about Maurice Solvang," far from suggesting mental incompetence, suggests instead that defendant was attentive, adept, and involved in the proceedings, and wished to point out to the jury a perceived inconsistency between the prosecutor's comments and conduct.

The transcript passages, concerning the waiver of which defendant now complains, do not support a different conclusion with regard to defendant's competence to stand trial. When asked by the court whether he understood that his waiver of trial also would waive his right to cross-examine witnesses, defendant replied: "Well. I don't really understand that I have the right to confront all witnesses against me, when a case is built around a witness such as Maurice Solvang, that was given—that took the Fifth Amendment. [¶]

[The prosecutor] refused to give him immunity from prosecution when he very likely is the killer, and they hide him from the jury. So I understand what the law is, and what you're saying; but I don't understand that it works quite that way. [¶] But I understand what you're saying; yes, sir."

Thereafter, following defendant's express waiver of his right to confrontation and cross-examination, the court addressed defendant's privilege against self-incrimination, inquiring, "Do you give up that right, sir?" Defendant responded: "Well, sir, I do as far as I have—I was in prison before, and now I'm not going to remain free for five years [as required by section 667.5, subdivision (b)]—but not as far as the reason for being in prison at this time. That much is true, so, yes." The court clarified that it was simply asking whether defendant was prepared to admit that the prior prison term allegations were true, in which event defendant would be incriminating himself. The court explained that it had "to be satisfied [that] you give up your right to do that." After defendant conferred with counsel, he clarified that he did indeed understand and waive his privilege against self-incrimination.

The court next inquired whether any threats or promises had been made to procure defendant's admission of the prior prison term enhancements. Defendant responded: "Yes. The threat of death by the State of California. The threat of life imprisonment. I don't see where my admitting or not admitting one or two years is going to make a difference, since I'm already convicted of something I didn't commit. There's no sense in me arguing with this. But no, sir, no—no threats have been made."

Viewed as a whole, we do not perceive in this colloquy, or elsewhere in the related transcript, evidence suggesting mental incompetence to waive rights associated with proof of the charged enhancements. Indeed, far from suggesting that defendant was "nonresponsive" throughout the waiver process, the record reveals instead that defendant was attentive and was reacting to both (i) the jury's verdict of guilt and (ii) what he perceived as an ironic inconsistency between the trial court's advisement that by waiving his right to trial he was giving up his right to confront witnesses against him, and his own assertion that he had been denied the right to confront witnesses by the prosecution's refusal to grant immunity to Maurice Solvang. Likewise, defendant's brief riff concerning "threats" made against him, as related to his admission of the enhancements, displayed an understanding of the proceedings and the general question posed, as well as an accurate perception of reality: given the minimum sentence of life in prison without possibility of parole that ensued from the jury's verdict of guilt and special circumstance finding, the sentence enhancements of two additional years were not a matter of great concern to defendant. Finally, the circumstance that defendant's responses concerning waiver of his privilege against self-incrimination initially were halting or disjointed does not detract from the subsequent waiver,

nor does it suggest, as defendant now implies, a general mental incompetence to waive his rights. We conclude that the trial court did not err in accepting defendant's waiver of trial as to the two sentence enhancements.

### Q. *Denial of effective assistance of defense counsel at the guilt phase of the trial*

Defendant brings together under one global claim the disparate allegations of asserted ineffective assistance of trial counsel, advanced above under various claims and subclaims. As noted above, in most respects we have concluded that the record does not preclude a satisfactory explanation for counsel's actions, and hence we do not find that counsel acted deficiently. (*Mendoza Tello, supra,* 15 Cal.4th 264, 266; *Pope, supra,* 23 Cal.3d 412, 426.) Defendant has failed to establish deficient performance under an objective standard of professional reasonableness. (*Strickland, supra,* 466 U.S. 668, 687–691; *Ledesma, supra,* 43 Cal.3d 171, 216–217.) In any event, for the reasons recounted *ante,* part II.C., defendant also has failed to establish prejudice, that is, a reasonable probability of a more favorable outcome in the absence of counsel's assertedly deficient performance. (*Strickland, supra,* 466 U.S. 668, 691–696; *Ledesma, supra,* 43 Cal.3d 171, 217–218.) As we have noted above, on the record before us it is not reasonably probable that, had trial counsel performed in a manner different from what defendant now challenges, the jury's verdict of guilt or special circumstance finding would have been different. We conclude that trial counsel's alleged failings, viewed singly or cumulatively, are insufficient to undermine confidence in the outcome. (*Strickland, supra,* 466 U.S. at p. 694.)

### R. *Asserted constitutional invalidity of CALJIC Nos. 2.01, 2.02, and 8.83.1*

Defendant asserts that CALJIC Nos. 2.01, 2.02, and 8.83.1—each of which instructed the jury that if one interpretation is reasonable and the other unreasonable, "you must accept the reasonable interpretation and reject the unreasonable"—together operated to create an unconstitutional mandatory presumption and lessen the prosecution's burden of proof. We have rejected this same argument in numerous prior cases (see, e.g., *People v. Millwee* (1998) 18 Cal.4th 96, 160 [74 Cal.Rptr.2d 418, 954 P.2d 990]) and do so here as well.

### S. *Cumulative effect of asserted errors committed at the preliminary hearing and the guilt phase of the trial*

Defendant realleges many of the asserted errors described above, claiming that even if these alleged errors are individually harmless, they are cumulatively prejudicial. As explained above, however, most of the alleged errors are

either noncognizable on appeal, or did not amount to error. Assuming some errors, however, as we have observed, "[e]ven when his life is at stake, ' "[a] defendant is entitled to a fair trial but not a perfect one." ' " (*People v. Hamilton* (1988) 46 Cal.3d 123, 156 [249 Cal.Rptr. 320, 756 P.2d 1348].) We conclude that defendant received a fair trial, and perceive no prejudice, cumulative or otherwise.

### III. CONCLUSION

The judgment is reversed as to penalty for the reasons set forth *ante*, part II.A. In all other respects, the judgment is affirmed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for rehearing was denied September 1, 2004.